### THE ORANGE.
No. 89.

Circuit Court of Appeals, Second Circuit.
Dec. 11, 1933.

Burlingham, Veeder, Fearey, Clark & Hupper, of New York City (Eugene Underwood and Chauncey I. Clark, both of New York City, of counsel), for appellant.

John E. Morrissey, of New York City, for appellee.

Before MANTON, L. HAND, and SWAN, Circuit Judges.

## PER CURIAM.

This appeal involves the liabilities growing out of a collision between the ferry Orange and the tug El Toro just outside the ferry's slip on the Manhattan shore of the North River, off Pier 43. The tug had a barge in tow on her port side and was bound up the river, looking to berth the tow at Pier 48, a thousand feet or more further up stream. The night being hazy with occasional thick patches of fog, she hauled in to about seventy-five feet of the pier ends, and was steaming up at reduced speed blowing fog signals. Her navigation both in the choice of her course and in what she did when the collision became imminent are such as to put her in fault; so the judge found, and so she now admits. The only question which she argues, and the only one which we shall discuss, is whether the ferry was also in fault, so that the damages should be divided.

We accept the findings of the judge, he having seen the witnesses, and having indeed found what we should ourselves have found, so far as we can tell from the record. We do not, however, agree with his disposition in point of law; that is, we impute to the ferry a fault which he did not find. The collision occurred shortly after the bows of the ferry cleared her slip on her way to the Jersey shore. She had blown her slip whistle (which is not shown to have been too short or ill-timed) after she had put out from the "bridge." She started at full speed to get an initial push, as is the custom, but almost at once slowed down to half speed until at a point about a hundred and fifty feet from the end of Pier 43, which bounds her slip on the south. Then, and then only, she made out the tug. Her navigation thereafter was well enough, but she had acted too late to stop her way altogether, and she struck the tug on her starboard quarter not far from the stern.

As the tug was clearly to blame, we are disposed to look at the ferry's conduct with a friendly eye; but still she seems to us to have been without the necessary lookout; to have imposed upon her master too many duties to be properly discharged. This is a fault which we have so often noticed as to require no further emphasis; we do not mean to make a fetich of it, but in a hazy, indeed a foggy, night, a lookout was especially imperative. The Cherokee, 45 F.(2d) 150 (C. C. A. 2); Dahlmer v. Bay State, etc., Co., 26 F.(2d) 603 (C. C. A. 1); The William A. Jamison, 241 F. 950 (C. C. A. 2).

Her deck crew were disposed as follows: On the main deck were two deck hands, one in the cabin where he was useless, the other forward, where he could indeed look straight ahead, but where his angle of vision was blocked by the racks on either hand until the boat got beyond them; he was useless as to craft coming up while the ferry was in the slip. The master was in the pilot house and could see over the racks, but he had the navigation of the ferry to mind, and by it his attention was necessarily diverted. He did not make out the tug until some time after she became visible, as we shall show; he was not such a lookout as the law demands. A second officer was on the upper deck, but had not yet got forward where he could share the master's duties; the quartermaster could see nothing. The ferry replies that in any event the sheds on Piers 42 and 43 shut off her view to the south until she was not far from the place where she in fact did make out the tug, and that the absence of a lookout could not have counted. An easy calculation from the charts proves, however, that this is not true. The shed on Pier 42 juts further into the river than that on Pier 43; but a line drawn across the northern corners of each cuts the north side of the slip along which the ferry was moving more than three hundred feet inside the end of Pier 43. A sharp lookout could have seen the tug when the ferry was that distance, and probably further, from the end of the pier. True, we cannot say that she could even so have stopped her way altogether; but we need not do so in order to hold her. It is she who must show that by no chance could she have escaped, and in that she failed.

Decree modified by holding both vessels at fault; damages divided.