**THE MONTROSE.**

Petition of EASTERN TRANSP. CO.

No. 16169.

District Court, E. D. New York.

Sept. 9, 1942.

Foley & Martin, of New York City (Christopher E. Heckman, of New York City, of counsel), for petitioner.

George B. Warburton and Abraham Kaplan, both of New York City, for claimant Welch.

Halpert & Burger, of New York City (I. G. Halpert, of New York City, of counsel), for claimant Santos.

Paul C. Matthews, of New York City (C. John Dirosse, of New York City, of counsel), for claimant Oxner.

Carpenter & Stevenson, of New York City (A. F. Richard, of Boston, Mass., and J. T. Carpenter, both of New York City, of counsel), for claimant O'Hara.

Bigham, Englar, Jones & Houston, of New York City, Thomas H. Walsh, of Boston, Mass., and Nathan Thompson, of Portland, Maine (Andrew J. McElhinney, of New York City, of counsel), for claimant Sheridan.

CAMPBELL, District Judge.

This is a petition for exoneration from or limitation of liability, filed by the Eastern Transportation Company, owner of the tug "Montrose".

This litigation finds its beginning in a collision between the fishing schooner "Mary E. O'Hara", and the barge "Winifred Sheridan", in Broad Sound, outside of Boston Harbor, Massachusetts, on the early morning of January 21st, 1941.

Three separate limitation proceedings have resulted from this accident. A petition was filed in the District Court in Boston by O'Hara Vessels, Inc., as owner of the "Mary E. O'Hara". A petition was also filed in the United States District Court in Maine, by the owner of the "Winifred Sheridan" when that barge was libeled in a suit instituted by some of the claimants herein, in the Maine Court.

The present proceeding was instituted in this Court by the owner of the Tug "Montrose", for exoneration or to limit its liability in connection with the various losses arising as a result of this deplorable accident.

At 7.45 A. M., January 20th, 1941, the Tug "Montrose" took the Barge "Winifred Sheridan" in tow, at Wings Neck, Massachusetts, the western terminal of the Cape Cod Canal, bound for Rockland, Maine. The "Winifred Sheridan" was 187.8 ft. long, 34 feet beam, and 16.3 ft. depth of hold, and was loaded with about 1,400 tons of coal.

The tow of the Tug "Montrose" was made up of three loaded barges in tandem fashion, the Barge "F. J. Bradley" being the head barge, the Barge "L. & W. No. 7" being the second barge, and the "Winifred Sheridan" being the stern barge. The Tug "Montrose" towed the said three barges through the Cape Cod Canal, and put in for Boston Harbor, with her tow, passing the Grave's Buoy Light, off the mouth of the Harbor, some time after midnight, and in the early hours of January 21st, 1941. As the Tug "Montrose", with her tow, proceeded to the Harbor, the "Montrose" gave the signal to the barges of her tow, to get up steam and prepare to anchor.

The wind was blowing from the northwest at varying velocities, estimated to be between 20 and 30 miles an hour, but shown by the records of the Weather Bureau at Boston, to have been from 17 to 20 miles an hour. The sea was choppy, the night dark and clear, with good visibility.

The tow of the "Montrose" was on a long hawser from the tug and on long intermediate hawsers from each other, and due to the condition of the wind, and sea, and the damage to the windlass of the "L. & W. No. 7", the Master of the "Montrose", believed that it was dangerous to attempt to shorten the hawsers, as would be required by the regulations, if the tow was taken into Boston Harbor.

The "Montrose" hauled her tow up to the northwestward and into the wind, leaving the flashing white buoy on the port side of the tow. After the "Montrose" had come well up to the northward of the white flashing buoy, so that her last barge, the "Winifred Sheridan", was closed to the buoy, the "Montrose" ordered the vessels composing her tow, to anchor, which the "F. J. Bradley" did, and the lines to the tug were cast off. Due to the fact that her windlass was out of order, the anchor of the "L. & W. No. 7" was not dropped, and she was held in position by the intermediate hawser with which she was still made fast to the barge "F. J. Bradley", which hawser had been considerably shortened. The "Winifred Sheridan" dropped back and anchored, and after the "Winifred Sheridan's" anchor had been dropped, and she was riding safely to her anchor, she was about 300 feet to the southwestward of the white flashing buoy.

There is a conflict in the evidence as to the exact time when the "Winifred Sheridan" anchored, but in any event, it was at a considerable time, at least over one-half hour, before the collision occurred. The "F. J. Bradley" was then about 300 or 400 feet to the northward of the "L. & W. No. 7", which was northward of the white flashing buoy, and the "Winifred Sheridan" was about 300 feet to the southwestward of the white flashing buoy.

Anchor lights were put out by all three of the barges in the tow. They were bright white lights which could be seen all around the horizon for a distance of two miles. On each of the barges there were two of these lights, one at the bow, and one at the stern. The "Winifred Sheridan" had an extra white light placed on the starboard corner aft on top of her main house, and there were white lights showing in the pilot-house, crew's quarters, captain's room and galley. Whichever of the lights were used they were sufficiently bright. The "Winifred Sheridan" did not, when anchored, obstruct the view of the light of the white flashing buoy.

Some time after the barges had been so anchored, the stem of the fishing boat "Mary E. O'Hara", which was coming into Boston, from the fishing banks off Nova Scotia, struck the "Winifred Sheridan" on her starboard after quarter, causing only slight damage to the "Winifred Sheridan". The "Mary E. O'Hara" did not at the time of the collision try to ascertain what damage was done to the "Winifred Sheridan", but apparently continued on, under the stern of the "Winifred Sheridan", up toward Boston. Shortly after striking the barge "Winifred Sheridan", the Master of the "Mary E. O'Hara" learned that she was taking in a considerable amount of water at the bow. He tried to beach her, but, before he could succeed,

the "Mary E. O'Hara" sank, between the white flashing buoy and the entrance buoys to the North Channel. The masts of the "Mary E. O'Hara" were still above water when she fetched up. Only five members of the crew of the "Mary E. O'Hara", who had climbed up in her rigging, were saved, and they were rescued by the fishing boat "North Star", which was also bound into Boston, and did not reach the sunken boat, until several hours after the collision.

The night was dark, and very cold, but clear, with good visibility for over 2 miles, and the Captain of the "Mary E. O'Hara", according to his custom, was in the pilot-house, all the time going from one side of the pilot-house, out on deck and then over to the other side. A man was at the wheel, and one of the crew named Conrad was supposed to be acting as lookout. He had gone on watch at 2.10 A. M., taken a trick at the wheel for thirty-five minutes, and gone on lookout at 2.45 A. M.

The "Mary E. O'Hara" had a foresail set on her fore-mast, which was rigged toward the port side as the wind was coming from the starboard side, and she also had a storm-sail, or riding-sail on her main mast. There were two nests of six dories each, both on the starboard and port sides of the deck, about 8 feet aft of the fore-mast, each nest being about 7 to 8 feet above the deck of the ship, and so heavily encrusted with ice as to bring the height of the top dory to about half again its usual height, and the boom of the fore-sail was about the same distance above the deck. The level of the floor of the pilot-house was the same as that of the main deck. The standing and running rigging were incased in ice, and the pilot-house itself was heavily iced, and under these circumstances the man at the wheel had but a very limited view ahead, and was compelled to depend on the lookout with respect to what was ahead. When Conrad came on lookout, he spoke to the Captain about the ice, and was told by the Captain to pound the ice off the shrouds. To do this, Conrad left his post near the fore-mast, and walked aft to the cabin, at the stern of the vessel, and then went down into the cabin and obtained a mallet or ice pounder, and when he had procured it, he then had to, and did, go back up forward again, and started pounding the ice off the halyards. This pounding continued for five or six minutes. After that Conrad left the deck a second time, and went down into the forecastle to see if the road was clear to bring the halyards down in the forecastle, during which time he had a talk with Welch. He then went back on deck, and was just getting ready to pound off the ice again, when, he says, that he saw a white light on the stern of a vessel, and because of the noise of the engines of the "Mary E. O'Hara", he had to walk back aft to the pilot-house, to report the light to the Captain. Conrad then walked forward again, and had just started to use the ice pounder once more, when the collision occurred. Over one-half of the time when Conrad was supposed to be on watch as lookout, he was attending to other duties, which made it impossible for him to keep a proper lookout.

The crew of the "Mary E. O'Hara" had been fishing on lays, and she was bound in to Boston, with the fish they had caught. The watches were not maintained, as before, but each man went on watch as notified by a member of the crew, the standing of the watches being controlled by the crew, resulting in uncertainty.

The fact that the "Winifred Sheridan" carried anchor lights was testified to by those called as witnesses for the "Winifred Sheridan", including the man who testified that he lighted them, as well as witnesses called by claimants. In fact, an overwhelming majority of all the witnesses, who saw her, testified that the "Winifred Sheridan" had anchor lights lighted, and displayed them, before the collision.

Conrad went on watch as a lookout about 2.45 A. M., and the collision occurred about 3 A. M., and even during the time that Conrad may have been looking out, his view was not good, as he stood about abreast of the fore-mast and about a foot aft of the forward part of the mast, which, with the sail trimmed to port, made it very difficult for him to see anything on the port hand, the side on which the anchored "Winifred Sheridan" was lying.

Had a proper lookout been maintained on the "Mary E. O'Hara", she could have easily avoided coming into collision with the "Winifred Sheridan".

The "Winifred Sheridan" was an anchored vessel, and the "Mary E. O'Hara" was a moving vessel, and the coming into collision of a moving vessel with an anchored vessel, makes out a prima facie case of negligence against the moving

vessel. The Oregon, 158 U.S. 186, 192, 15 S.Ct. 804, 39 L.Ed. 943.

■ The contention of the claimants that the Tug "Montrose" was at fault, in towing with long hawsers between the tug and head barge, and between the barges, before she directed the "Winifred Sheridan" and the other barges of her tow to anchor, was not sustained. The Regulations with respect to the length of hawsers between towing vessels and sea-going barges, Section 3, Regulations, approved by the Secretary of Commerce, Pilot Rules, Edition of May 28th, 1940, p. 44, provides as follows:

"In all cases where, in the opinion of the master of the towing vessel, it is dangerous or inadvisable, whether on account of the state of the weather, or sea, or otherwise, to shorten hawsers, hawsers need not be shortened to the prescribed length, except that hawsers must in any event be shortened to the prescribed length upon reaching the applicable locality named below: * * *."

Neither Broad Sound nor Boston Harbor were among the localities named below.

On behalf of the claimants, it is contended that the "Montrose" was at fault in causing the "Winifred Sheridan" to anchor in a navigable channel. The only applicable statute is the Act of March 3rd, 1899, Chapter 425, Section 15, 30 Stat. 1152.

Title 33, U.S.C.A. § 409, which provides as follows: "Obstruction of navigable waters by vessels; floating timber, marking and removal of sunken vessels. It shall not be lawful to tie up or anchor vessels or other craft in navigable channels in such a manner as to prevent or obstruct the passage of other vessels or craft; * * *."

■ The claimants' contention is too broad, as the anchorage in navigable channels is unlawful, only if the position of the anchored vessel is such that other vessels navigated with due care cannot pass without danger of collision. The Strathleven, 4 Cir., 213 F. 975; Dahlmer v. Bay State Dredging & Contracting Co., 1 Cir., 26 F.2d 603; American Hawaiian S. S. Co. v. Merriam et al., 4 Cir., 124 F.2d 45; The Perseverance, 2 Cir., 63 F.2d 788.

■ The "Winifred Sheridan" was not anchored in any particular channel but in open waters, Broad Sound, and beyond the limits of North Channel, and a vessel of the draft and size of the "Mary E. O'Hara", if properly navigated, would not have had the slightest difficulty in entering North Channel with the "Winifred Sheridan" anchored where she was. In fact, the "Mary E. O'Hara", after the collision did so, without any apparent difficulty, and sank only because of her damaged condition.

I do not question the fact, that under the broad definition of the word "channel", in tide water, found in The Oliver, D.C., 22 F. 848, the "Winifred Sheridan" was anchored in the Channel, but the "Winifred Sheridan" at anchor did not interfere with the navigation of the "North Star", which passed on a course usually followed by ships bound in and out, nor would she have interfered with the "Mary E. O'Hara", if properly navigated, nor did she interfere with the "Mary E. O'Hara", as that vessel was not properly navigated.

On behalf of the claimants, there is cited The Lehigh, D.C., 12 F.Supp. 75, on which they strongly rely, but that case is not in point, as it is clearly distinguished on the facts.

This is further borne out by the laying off on the chart of the sailing directions given on page 294 of the United States Coast Pilot.

[5] The "Winifred Sheridan", as anchored, did not shut off the light of the white flashing buoy, and that light, in addition to the "Winifred Sheridan's" lights, would acquaint any vessel, having a proper lookout, of her presence, and that was an advantage of her position. American Hawaiian S. S. Co. v. Merriam et al., supra.

■ In determining the place of anchorage, a Master is entitled to the same exercise of judgment as is permitted, on all other occasions. The Socony No. 9, 2 Cir., 74 F.2d 233.

No point can be made by the claimants of the failure to shorten the hawser between the "F. J. Bradley" and the "L. & W. No. 7", as neither of them, nor the hawser between them, was struck by the "Mary E. O'Hara", and there was clear open water for at least 400 feet between the "L. & W. No. 7" and the "Winifred Sheridan".

■ Whatever be the theory of the claimants, as to the lack of lights on the "Winifred Sheridan", it seems to me, that it is not supported by the evidence, but by the assumptions and suggestions of Counsel, and however plausible they may be, they do not take the place of evidence. Equitable Life Assur. Soc. of United States v. Guiou et al., 8 Cir., 86 F.2d 865, 868.

724

Whichever may be claimants' theory, they are all based on the contention that the "Winifred Sheridan" was not showing any lights, and the overwhelming force of the evidence is to the contrary.

The tug and the barges, including the "Winifred Sheridan", had been under way and had been showing the lights required by the regulations, and on anchoring the barges at once showed the regulation anchor lights, and the only way the "Winifred Sheridan" could have been without lights, would have been to shut off the lights which she showed while in motion, without putting out any anchor lights. This is denied by the man who attended to the change of lights, who says that the anchor lights were lighted and displayed, and his testimony and that of the Master and Mate of the "Winifred Sheridan", and those on other boats who saw the lights must be, and has been given, greater weight than that of Conrad, who was the lookout on the "Mary E. O'Hara", and who says he saw but one white light, after he came on deck, after he had visited the forecastle, and this apparently was the only light he saw, notwithstanding the fact that not only was the "Winifred Sheridan" displaying the regulation lights viz.: one white light at the bow and one white light at the stern, each visible all around the horizon, but both the barge "L. & W. No. 7" and the "F. J. Bradley" were showing the same regulation anchor lights, and the tug "Montrose", which was passing up and down from one end of the tow, to the other, was showing sailing lights red, and green side lights, a white head light, and one staff light, the latter visible all around the horizon. In addition to all of this was the light of the white flashing buoy all within one mile. Not only does the testimony show that there were lights, on the "Winifred Sheridan", but the probability is, that with her crew on deck after having anchored, the anchor lights were lighted, and the barge was not dark.

Probability is always a guide in determining the truth as to a question of fact. The Black Diamond, 2 Cir., 273 F. 811; The Gypsum Prince, 2 Cir., 67 F. 612.

It is uncomprehensible that a proper lookout could have escaped seeing more than one white light, and in conjunction with the other duty imposed on him by the Captain of removing the ice from the halyards, and his absences from his post as lookout, and his return to his post only about one minute before the accident, it is apparent that a proper lookout was not maintained on the "Mary E. O'Hara", and that was a grievous fault and spells out a prima facie case of negligence against the "Mary E. O'Hara". Delaware, L. & W. R. Co. v. Central R. Co. of New Jersey, et. al., 2 Cir., 238 F. 560; The Madison, 2 Cir., 250 F. 850, 852; The Propeller Genesee Chief et al. v. Fitzhugh et al., 12 How. 443, 462, 13 L.Ed. 1058; The Ariadne, 13 Wall. 475, 20 L.Ed. 542.

A lookout cannot have his attention distracted by the performance of other duties while he is acting as lookout, but must concentrate his attention exclusively on maintaining a proper lookout. The Wilbert L. Smith, D.C., 217 F. 981, 984; The J. C. Ames, D.C., 121 F. 918, 921; The Mary T. Tracy, D.C., 298 F. 528, 532.

The failure to maintain a proper and efficient lookout on the "Mary E. O'Hara", was the sole and proximate cause of the collision.

The contention of the claimants that the anchor watch on the "Winifred Sheridan" should have signaled the "Mary E. O'Hara", with a search-light, or by calling, is not sustained.

No such duty is placed upon an anchor watch. The Gate City, D.C., 90 F. 314, 320; Brigham v. Luckenbach, D.C., 140 F. 322, 329, 330; The Lady Franklin, 14 Fed.Cas. pages 934, 935, 936, No. 7,984.

Not only was the use of the flash-light, or calling, not required, but, even if it had been done, it would have been useless, because, if the bright anchor lights could not be seen by the lookout, a flash-light would not have been seen, and due to the noise of the "Mary E. O'Hara's" engines, a call of the human voice would not have been heard.

The fault, on the part of the "Mary E. O'Hara", was so clearly shown, and was so adequate, to account for the collision, that this Court should not be assiduous in its efforts to find a possible fault on the part of the tug "Montrose". The Cherokee, 2 Cir., 45 F.2d 150, 153; The City of New York, 147 U.S. 72, 13 S.Ct. 211, 37 L.Ed. 84; The Fort St. George, 2 Cir., 27 F.2d 788; The Lexington, 2 Cir., 275 F. 279.

This was a most deplorable accident, but I cannot see in what respect the "Montrose" can be held to be responsible. The loss of so many lives might have been pre-

vented, if the "Mary E. O'Hara", after the accident, had been brought alongside the "Winifred Sheridan", and the crew of the "Mary E. O'Hara" had gone over on board the "Winifred Sheridan". The failure to put the "Mary E. O'Hara" alongside the "Winifred Sheridan" may have been an error of judgment on the part of the Master of the "Mary E. O'Hara", but I do not see how he could have hoped to beach her, after he learned of the inflow of water at the bow, due to the depth of water in which she was navigating, and the distance to shallow water. In any event, a large number, if not all, might have been saved, if the dories aboard the "Mary E. O'Hara" had been covered, and not permitted to become enclosed in ice.

If covered, the cover might have been cut away, and several, if not all of the dories might have been put overboard, and some at least, if not all of the crew found safety in them. The failure to cover the dories was negligence of the "Mary E. O'Hara", which cannot be ascribed to the "Montrose".

The tug "Montrose" and the petitioner Eastern Transportation Company, are without fault, or blame, and a decree exonerating the petitioner should be entered.