**MORAN TOWING & TRANSP. CO., Inc. et al. v. UNITED STATES.**

**UNITED STATES v. MORAN TOWING & TRANSP. CO., Inc. et al.**

**THE PC-451.**

United States District Court
S. D. New York.
July 1, 1948.

Burlingham, Veeder, Clark & Hupper, of New York City (Chauncey I. Clark and Eugene Underwood, both of New York City, of counsel), for Moran Towing & Transportation Co. Inc.

John F. X. McGohey, U. S. Atty., of New York City (Alfred T. Cluff, of New York City, of counsel), for the United States.

RYAN, District Judge.

Two suits in the admiralty are brought as a result of a collision which occurred in the open waters of the Florida Straits about 11 miles eastward of Fort Lauderdale, Florida, on December 26, 1941 at about 5.45 a. m. G.M.T. less 3 (4.45 a. m. E.S.T.), between the Nancy Moran, a seagoing tug, and the PC-451, a United States Navy Patrol craft.

In one suit Moran Towing & Transportation Co. Inc., bareboat charterer, and General Motors Sales Corporation, owner of the Nancy Moran, seek to recover damages for her total loss from the United States under the Public Vessels Act 46 U.S.C.A. §§ 781-790.

The second suit is a cross-libel filed by the United States for damages alleged to have been sustained by the PC-451 in the amount of $4,000. In their answer to the cross-libel the operators and owners of the Nancy Moran claim the benefit of the statutes for limitation of liability, 46 U.S.C.A. § 183 et seq.

At the close of the trial, the Government moved to amend its cross-libel and to increase the claim for damages to the PC-451 from "approximately $4,000." to $7,106.17. This was opposed and it was urged that since limitation of liability had been plead-ed no amendment to the ad damnum clause should be allowed at this late date.

The pleading of limitation of liability in an answer does not in and of itself preclude a subsequent motion to increase the amount of the ad damnum clause. Limitation of liability may be sought either by a defense set up in the answer under Section 183 or by petition under Section 185, 46 U.S.C.A. The six-month limitation on the filing of a petition for limitation of liability provided for in the latter section does not apply to the defense of limitation of liability in an answer. The Chickie, 3 Cir., 141 F.2d 80.

Judge Bright in Cantey v. McLain Line, Inc., et al., D.C., 40 F.Supp. 887, wrote at page 889:

"Statutory provisions for limitation of liability should be construed liberally in order to effect their beneficent purposes. Larsen v. Northland Transportation Co., 292 U.S. 20, 24, 54 S.Ct. 584, 78 L.Ed. 1096. The trend of present day procedure is likewise on the liberal side, and I am content to adopt the language of Rule 15(a) of the Federal Rules of Civil Procedure (although under Rule 81(a) it has no application here), that leave to amend 'shall be freely given'. 28 U.S.C.A. following section 723c."

These views are now followed and the amendment to the cross-libel permitted.

Now, I am called upon to decide which vessel, if either, was at fault. From the testimony presented I make the following findings—

*The Nancy Moran—*

The Nancy Moran was 21 days in service when she sank following the collision. She was of steel construction, 105' long, 25' beam and 11' deep; she was 212 gross and 69 net tons; she was propelled by a 1200 horsepower diesel motor which was controlled from the pilot house. The hull of the Nancy Moran was painted black and the housing, green. She could manoeuvre easily—making 14 knots over the ground with her rudder put hard to the right, the Nancy Moran could make a complete circle without advancing more than 200'. She could back very quickly from full ahead and with the control put to full astern she

could be completely stopped in less than two and a half times her length—within about 250'. Her pilot house was built well to the bow. The forward part of the pilot house was set back no more than 15' from her stem.

### The PC-451—

The USS PC-451 was a patrol craft of steel construction, manned by the United States Navy. She was 165' long at the water line, 170' over all, 21' maximum breadth, displacement 360 tons. The pilot house had bridge wings on port and starboard sides. She was equipped with a gyro compass with the steering repeater by the helm and a repeater on each bridge wing. Her main power plant consisted of two 2,000 horsepower, 16 cylinder diesel engines driving with twin screws. Her cruising speed was 19 knots. The diameter of her turning circle on a hard right was 250 yards and on a hard left, 275 yards. To accomplish a change of 45 degrees left, the advance would be about 75 yards and the transfer approximately 60 yards. From full ahead, at 15 knots, to full astern the advance of the PC-451 was between 180 and 200 yards; and on a crash back test the ship was dead, when traveling at 15 knots, in about 33 seconds.

### The Crew of the Nancy Moran—

The Nancy Moran was under-manned. She had but two licensed officers—a master and a mate—in her deck complement, instead of three as required by statute, 46 U.S.C.A. § 223. She had only two seamen in her deck complement, and here too she was under-manned, being short one seaman and an extra day-man. Her seamen and licensed deck officers were, because of the shortage of personnel, standing two "6"-hour watches in each 24 hours instead of the required three watches of "4" hours on and "4" off, 46 U.S.C.A. § 673. The Nancy Moran had no lookout and no seaman exclusively charged with the duties of a lookout. At the time of the collision there were on deck only the mate, Johansen, who acted as deck officer and seaman Holland, the quartermaster, both of whom had come on at 12 m. She was also short a man in the engine room and altogether carried a crew of ten only instead of the usual fourteen.

### The Crew of the PC-451—

The PC-451 was fully manned at the time of the collision. Her captain was in the pilot house acting as navigator or officer of the deck; there were two bow lookouts and a lookout on both the starboard and port bridge wings. In addition to the captain there were in the pilot house the helmsman, a telephone talker and a sound gear operator. The PC-451 had a crew of three officers and fifty-three men, which was an ample number to man her adequately.

### The Course of the Nancy Moran—

The Nancy Moran sailed from New Orleans at about 12.45 p. m. on December 23, 1941, bound for New York. Before leaving New Orleans, her master received instructions and orders from the United States Navy to run without lights; no particular route had been designated for her to follow. She was running light on the night of December 25–26, 1941, proceeding northward through the Florida Straits. At 11.33 p. m. she was abeam of Molasses Reef Lighthouse, on a course of 40 degrees True, 41 degrees on compass, 1 degree easterly deviation; at 12.40 a. m. she was abeam Carysfort Reef Lighthouse, distant 9.5 miles; at 1.36 a. m. she was abeam Pacific Reef Lighthouse, distant 7.5 miles. The last fix of the Nancy Moran, prior to the collision, was at 2.31 a. m. when Fowey Rocks Lighthouse was abeam, distant 8.5 miles. The course of the Nancy Moran from that point on until the collision was 6 degrees P. S. C., 7 degrees T.

### The Course of the PC-451—

The PC-451 had been ordered out of Key West on December 24, 1941 to patrol the Florida Straits against submarines and to meet and escort to the southward a troop convoy. This was her mission at the time of the collision; she was accompanied by the USS Biddle—a 1200 ton destroyer. During the afternoon of December 25, 1941 she patrolled north in the Florida Straits in the hope of meeting the convoy before the end of daylight. She had not been successful and at nightfall she turned south and proceeded in a general southerly direction down the Florida Straits, about 11 miles off the Florida Coast. She was traveling substantially in the axis of the Gulf Stream

current where northbound traffic might be encountered and where customarily only northbound traffic proceeded. Throughout the night she had maintained a course of 180 degrees T., 181 degrees P. S. C. at a uniform speed of 15 knots, both of which were maintained until the collision encounter. Her last fix, prior to the collision, was at 4.36 a. m. when she passed the Hillsboro Inlet Lighthouse abeam to starboard, distant 11 miles. The PC-451 was running without lights also.

*The Time—*

At 3 a. m. the Nancy Moran advanced her clocks to Eastern Standard Time. The PC-451 was traveling on Greenwich time plus four, i. e. when it was 4 a. m. on the PC-451 it was 3 a. m. on the Nancy Moran. The collision occurred at 4.45 a. m. by time of Nancy Moran, 5.45 a. m. by time of PC-451.

*The Sea and Visibility—*

The sea was smooth and there was a light wind easterly, force 2. The atmosphere was clear but overcast, and it was a very dark night; there was no moon. There was very poor visibility for unlighted objects and darkened ships. There was no horizon anywhere.

*The Relative Positions of the Ships when they First Encountered—*

The testimony presents a sharp issue on the important and basic factual question of the relative positions of the vessels on their actual courses when they took alarm.

Nancy Moran has pleaded and contends that there was a head-on meeting. PC-451 has pleaded and contends that it was a starboard-to-starboard situation.

On this, the testimony of Johansen, the mate, is the only affirmative proof offered by the crew of the Nancy Moran. Andersen, the master, was at the time of the first sighting in his stateroom immediately abaft the pilot house. Efforts to locate Holland, the quartermaster and helmsman, it is conceded, have been diligently but unsuccessfully made; we have no testimony from him.

Johansen held an unlimited master's license since 1921 He was an officer of long experience. He was navigating the Nancy Moran with Holland at the wheel. Johansen stood close up to the open window on the port forward side of the pilot house keeping a lookout. The Nancy Moran had no navigating lights and the pilot house was completely dark, save for the shaded compass light. She was running at a speed of 11.5 miles through the water with her engine control throttle at position "14", which for running purposes was considered full speed. With the acceleration of the current of the Gulf Stream, the speed over the ground was about 15 knots.

Johansen testified that he saw a dark object ahead, a little on the port bow—about 4 degrees on it. It looked like a cloud or smoke on the water; he could not make any ship shape of it. He gave the quartermaster an order, observed and checked its execution and then turned back to observe again the dark object. At that time, he testified he saw "a loom like of a ship heading right for me * * * she was heading right for my pilot house;" her original bearing hardly changed. By Johansen's version the vessels were meeting practically end-on.

Aboard the PC-451, Boulware, the commanding officer, was navigating from the pilot house. Swindal, a seaman, was steering; Mackel, a petty officer, was on the starboard wing of the bridge; Smith, an acting chief boatswain, was on the bow as lookout to port; and, Pierce, a machinist's mate, was on the bow as lookout to starboard.

The first sighting of the Nancy Moran from the PC-451 was by Mackel from the starboard bridge wing. He testified that he first sighted her as "a dark object * * * approximately 2 points on my starboard bow * * * about 200 yards" distant. He observed the Nancy Moran to be on a parallel opposite course.

Pierce, on the bow as lookout to starboard, had been at sea 5½ years; his experience was confined to the engine room save for about three weeks occasional duty as lookout. His testimony cannot be accepted as reliable or dependable; careful reading and analysis of it confirms this impression. In any event, he did not sight the Nancy Moran until after Mackel had first reported her.

Smith, on the bow as lookout to port, had been in service 18 years. He, too, did not sight the Nancy Moran until after Mackel. Study of his deposition confirms the finding that he was neither alert nor attentive as is required of a lookout. His testimony does, however, cast doubt on the accuracy of the observations Mackel says he made. Smith testified that "the first thing I spotted" (on the Nancy Moran) "was a green running light. It was a matter of seconds when I spotted a red running light. * * *" The Nancy Moran had apparently begun a right swing, for he testified that it was not more than 2½ seconds between the green and red lights; she was 2 points on the PC-451's starboard bow. Smith was standing a little to the port off the center line of the ship. However, Mackel testified that at no time did he see the green running light of the Nancy Moran; that when he first sighted her she was without lights and that when her lights broke out he saw her red light only.

Swindal, at the wheel amidship in the pilot house of the PC-451, found it so dark that he could not see anything until the lights of the Nancy Moran came on. He testified that the first knowledge he had of the vessel, subsequently identified as the Nancy Moran, was when Mackel came running into the pilot house and reported, "There's a ship in close to starboard, the starboard bow."

Boulware, the commander of the PC-451 stationed near the helmsman and patrolling back and forth across the pilot house from one wing of the bridge to the other, testified that the first indication he had of the Nancy Moran was when the starboard wing lookout reported a dark object on the starboard bow, "close aboard on the starboard bow." He further testified that he took about two steps to the starboard wing door and "looked * * * down the line of the pilothouse in the direction indicated. * * *" and saw a dark object which was apparently a ship "approximately 30 degrees on our starboard bow;" the ship was distant 300 to 400 yards and 150 yards to the west of the course of the PC-451. Concerning the lights which later showed on the Nancy Moran Boulware's testimony leaves an impression of uncertain and hazy recollection.

When the Nancy Moran's lights broke out he saw the "red" but did not remember seeing the green; later he testified that the masthead light and the red were all he saw, "that is all the lights I am sure of seeing. * * *"

With this sharp conflict in testimony, we look for the little straws—pieces of evidence which can aid in determining the relative positions of the ships when they first encountered. The El Sol, D.C., 45 F.2d 852, 854. We find them in the conflict of the testimony of Mackel and Smith; the uncertainty of the testimony of Boulware— his statement (although later changed) that to first sight the Nancy Moran he "looked down the line of the pilothouse in the direction indicated,"—and the testimony later discussed. Nor, can we entirely ignore the testimony of Andersen, the master of the Nancy Moran, that following the collision, Boulware told him (after they had checked their courses to locate their positions) that when he picked up the Nancy Moran "she was a little on his starboard bow."

The testimony of Johansen is accepted as correct and accurate as to the relative positions of the vessels when they first encountered. It was practically an end on meeting; the PC-451 was about 4 degrees on the Nancy Moran's port bow.

### The Navigation of the Nancy Moran and her Lookouts—

When Johansen sighted the PC-451 he ordered the wheel to be put hard right. He sounded no whistle at that time, put no lights on and maintained the speed of the Nancy Moran. Looking back after checking the wheel and finding it hard over right, he observed the PC-451 coming on very fast; then, he turned and stepping back two or three steps to the rear of the helmsman put on the master switch which controlled all the running lights. He then switched on the general alarm to rouse the crew out to all quarters; the PC-451 continued to come on very fast; the Nancy Moran had swung about 2 points; and, about half a minute after sighting the PC-451 her bow struck the Nancy Moran on the port side—about midship, 6 points from the bow. As soon as she struck he stopped the engines.

■ No fault is found with the navigation of the Nancy Moran. The head-on meeting called for a hard right rudder. The Sabine Sun, D.C., 21 F.2d 121; Art. 18 of the International Rules, 33 U.S.C.A. § 103. The Nancy Moran had her rudder consistently hard right from the moment of alarm to the collision—a period of not more than 25 to 30 seconds, and the distance between the vessels at the moment of first sighting was fixed at 100 yards, more or less, according to Johansen's testimony. Estimates of both time and distance given under such conditions are notoriously unreliable. The William E. Cleary, 2 Cir., 235 F. 107, 109; The Stifinder, 2 Cir., 275 F. 271, 276. There is some conflict in the testimony on these points. Aboard the PC-451, Boulware fixes the time from alarm to collision at 25 to 30 seconds and the distance apart as between 300 to 400 yards; Mackel sets the time as within 30 seconds and the distance as about 200 yards. The time for appraisement of the situation was short; the quarters close, the danger imminent and impending. There was time, however, even though short for the Nancy Moran to comply with Article 23 of the International Rules and sound the one-blast signal. The Nancy Moran does not come within the condemnation of James McWilliams Blue Line, Inc. v. Card Towing Line, Inc., 2 Cir., 168 F.2d 720, 721 where the court said,

"We have several times held that neither one of two vessels meeting head and head may put her rudder right until she gets an answer to her invitation to a port-to-port passing * * *."

Because of the close quarters and immediate threatening danger the Nancy Moran was not required to await an answer, but she was not excused from giving a one-blast signal.

■ I find the Nancy Moran at fault for not sounding her whistle when she changed course to hard right. She cannot be exonerated from this fault because the testimony does not convince me that her failure to comply with this law of the sea did not contribute to the collision. The Corinthian, 11 Aspinale, M.C. (N.S.) 264 Admiralty. A single blast from the Nancy Moran, timely given, might well have resulted in the PC-451's immediately putting her rudder hard right also and not delaying during those critical seconds until the lights of the Nancy Moran first broke out. Prudence required that the single blast signal be given. I also find the Nancy Moran at fault for not showing her lights at the time she executed the hard right rudder. The exercise of due care dictated that this be done. The Corozal, D.C.1944, 62 F.Supp. 123.

■■ The Nancy Moran was proceeding with no lookout at all. She came on the scene of the meeting burdened with this antecedent fault. The Ariadne, 13 Wall. 475, 478, 20 L.Ed. 542; The Patria, 2 Cir., 107 F. 157, 159. The Nancy Moran had the burden thrust upon her of proving that her lookout failure not only was not, but could not possibly have been, a contributing factor. The Pennsylvania, 19 Wall. 125, 22 L. Ed. 148. This burden has not been satisfactorily sustained. I cannot find from the testimony presented that had the Nancy Moran been properly manned and with a sufficient number of competent lookouts aboard the PC-451 would not have been sighted earlier at a considerably greater distance—sooner than 25 seconds prior to collision. I find the Nancy Moran at fault for failure to keep and maintain a proper and sufficient lookout.

■ She is also burdened by the fault of her inadequate navigating personnel. Her mate and helmsman in the two and a half days at sea, prior to the collision, had been standing a succession of alternating 6-hour watches including three night watches under blackout conditions.

"It is a matter of common knowledge that safety in anything which requires human effort depends, in the last analysis, on the human being. A weary man is infinitely more dangerous than a defective pipe or an obscured light, because he is unfit to discover the unfitness of the inanimate object." Hough, J. in Union-Dalzelline (United States v. Steamtug Union), D.C.S.D.N.Y. 1932 A.M.C. 1331, 1336.

It cannot be said with any certainty that this fault may not have been a contributing cause of the collision. With the mate and the helmsman given proper hours of rest, they might well have been more alert and

keen. New York Marine No. 10, 2 Cir., 109 F.2d 564. I find the Nancy Moran negligent and at fault in that she was inadequately manned and that at the time of and prior to the collision, her watch officers and helmsmen were required to stand excessive watches, which impaired their efficiency and contributed to the cause of the collision.

### The Navigation of the PC-451 and her Lookouts—

A picture of confusion aboard the PC-451 comes with a reading of the testimony of her crew.

Pierce, the machinist's mate, was, as we have noted, starboard lookout on the bow. His observations reflected his limited three-weeks' training to assume the duties of lookout. He had neither glasses nor a phone connecting with the bridge. He testified that looking forward with a range of about 45 degrees on both starboard and port, he saw "in and around three points off the starboard bow, this light flared up * * * a bright light first and then I saw a red light," it was cutting across the bow "before I could lay down, it throwed me down. It happened in about four or five seconds," after he first saw the light. Just what Pierce was doing and where he was looking during the 20 to 25 seconds prior to sighting the lights of the Nancy Moran, his deposition does not tell us. It is apparent that he was neither alert nor attentive to his duties. Pierce testified that within 2 or 3 feet of him and to the rear stood the acting chief Smith, the port lookout; that he told Smith about the lights and that the latter reported to the bridge after Pierce saw the lights; and that the Nancy Moran was about 200 or 300 feet off when he saw the lights.

Smith had earphones and a mouthpiece connecting him with the bridge. He testified that one could see 400 to 500 yards off, that "the first thing I spotted was a green running light. It was a matter of seconds when I spotted a red running light and very shortly after that, we collided;" and that only "a few seconds" elapsed. The Nancy Moran, he testified, was approximately 150 feet off, "two points on the starboard bow" when he saw her green light. Concerning Pierce's observations he testified, "I saw

the green light and he saw the red one. * * * I had already reported the green light and he saw the red light at the same time that I did." He also stated that it was not more than two and a half seconds between the green and red lights and less than six seconds from the time he saw the green light to the collision. When this is read along with the testimony that the Nancy Moran was sighted from the starboard bridge wing 25 to 30 seconds before the collision, one begins to wonder what Smith was doing during the 16 to 21 seconds prior to his sighting the green light of the Nancy Moran. But the wonder ceases when the testimony of his reports to the bridge is read. Smith testified that he made only one report over the phone—that of the green light—and "I hollered, 'Red light to starboard'" to the bridge but not over the phone. By way of further detailing this, he testified that he reported the green and red lights practically at the same time, "it was all in the same breath." I find the performance of the two lookouts on the bow negligent and inefficient.

And, on the bridge, Boulware testified that "the only thing I can remember of the lookout forward, I heard him yelling a report over the telephone but I didn't have time to get exactly what it was. I heard him talking * * * in a loud voice." Just why the commander of the PC-451 did not pause for a second at that time to get the report of the lookout forward is difficult to understand. It may be that on this point, too, his recollection and memory have been dulled by the passage of time, as they were concerning his sighting of the Nancy Moran's lights, and as to whether he went out on to the starboard bridge wing twice or only to the doorway leading from the pilot house to the wing. When we look for an explanation of his subsequent order of left rudder, followed by the order of full right rudder, we come to the conclusion that he listened at great peril to his ship to the confused reports of this lookout forward, reporting over the phone the sighting of the green light immediately followed by the same man's yelling (not over the phone) to the bridge the sighting of the red light of the Nancy Moran. One would expect the left rudder order to follow the report of the

green light and the full right order to follow the report of the red light.

 And on the starboard bridge wing, Mackel, the quartermaster, was attempting to act as lookout in addition to performing his other duties of keeping the quartermaster's notebook, handling communications on the watch and taking beam bearings. His divided duties made of him an insufficient lookout. In The William A. Jamison, 2 Cir., 241 F. 950, 952, the court spoke of "a divided duty, which the law will not accept as performance." See also The Orange, 2 Cir., 68 F.2d 307. In The Montrose, D.C.E.D.N.Y., 47 F.Supp. 719, 724, the rule was succinctly stated,

"A lookout cannot have his attention distracted by the performance of other duties while he is acting as lookout, but must concentrate his attention exclusively on maintaining a proper lookout."

It is immaterial that at the time the Nancy Moran was sighted by him, Mackel's other duties required nothing of him at the moment, for as the court observed in The Koyei Maru, 9 Cir., 96 F.2d 652, at page 654:

"The chief officer had other duties to perform beside those of lookout. They were 'standby' duties, which consisted in supervising anything necessary to make the vessel shipshape forward after her departure from her dock, a short time before. * * * Even if the chief officer had attended to none of the 'Standby' duties on leaving the harbor, they were a charge on his mind as the crew worked on the matters to be done around him which disqualifies him as a free and single-minded lookout."

We are told that there were additional lookouts on duty aboard the PC-451 at the time of the encounter—one on the port bridge wing and others about the vessel— but none of them have been produced as witnesses and no depositions from them presented, and no proof offered to account for the failure to produce evidence from them.

Then, we find that the PC-451 was proceeding on a course in the middle of the Gulf Stream—a track customarily followed by northbound vessels. She was south-bound, blacked-out and traveling at high speed. It is not disputed that ordinarily southbound vessels travel not more than three miles off shore reserving the axis of the Gulf Stream for northbound vessels. The United States Coast Pilot, Atlantic Coast, Section D, Cape Henry to Key West, with supplement dated December 6, 1946, Serial No. 582-8, establishes this custom, saying,

"When bound southward the vessels attempt to avoid the full northerly set of the Gulf Stream and therefor either run eastward or westward of the current. When northbound the current of the Gulf Stream is utilized." (p. 47)

"Jupiter to Fowey Rocks.—Vessels follow the coast as close as safety permits—in the daytime at a distance of 1 to 1½ miles to Hillsboro Inlet Lighthouse, then 1½ to 2 miles off—and pass 1 mile eastward of Miami Lighted Whistle Buoy No. 2 and Fowey Rocks Lighthouse." (p. 52)

The Commanding Officer of the PC-451 admitted his knowledge of the custom. Instead of passing Hillsboro Inlet Lighthouse 1½ to 2 miles off, the PC-451 passed it 11 miles off. The place of collision as plotted on the chart is 12½ miles off the Florida Coast at Hollywood. There is no doubt that the PC-451 was proceeding in violation of the custom.

 Were the PC-451 a civilian vessel she would be at fault for so proceeding. The City of Washington, 92 U.S. 31, 23 L.Ed. 600; The Edward E. Loomis, 86 F.2d 705; The Norne, 5 Cir., 59 F.2d 145. The PC-451, however, was a naval vessel at sea in time of war, engaged on a military mission. Although the custom was known to her commanding officer, his military duties compelled, in his judgment, a deviation from this custom, and while neither the courts nor custom can dictate the particular lanes of travel to be used by a naval vessel in time of war, performing military duties, when navigating in open waters unobstructed by dangers to navigation, the fact that the PC-451 was proceeding south in a lane customarily used by northbound vessels places upon her and her commanding officer the duty of vigilance and care. This obli-

gation was not fulfilled, as would be expected of a prudent navigator under the circumstances, by the lookouts aboard the PC-451.

 I find the PC-451 at fault for failing to keep a substantial lookout, in that her starboard bow lookout was inexperienced, inalert and inattentive; her port bow lookout also inalert and inattentive; and, her starboard bridge wing lookout had divided duties to perform.

When considering the navigation of the PC-451, we come again to the testimony of Mackel, the starboard bridge wing lookout who first sighted the Nancy Moran. Mackel testified that at the first sighting of the darkened object off the starboard bow it appeared to be a ship on a parallel opposite course; that he determined this just about the time when he first saw it and that he did not have to wait. For some reason, unexplained, although Mackel was convinced that the Nancy Moran was on a parallel opposite course he did not make that report to the bridge. He simply reported "dark object 2 points on my starboard bow, distant about 200 yards." He testified that at the time he was not sure whether the ship he had sighted was a submarine, but, in any event, he did not report having sighted a vessel which might possibly be an enemy submarine. He further testified that immediately upon this sighting, he stuck his head into the door of the pilot house and made the brief and incomplete report of his sighting.

 Then, Boulware, the commanding officer of the PC-451, testified that he took about two steps to the starboard bridge wing door of the pilot house and looking out observed a dark object which was apparently a ship. He was in fact sure it was a small ship of some sort, from the shape of the outline, and he had a great deal of experience in estimating sightings under darkened conditions. Boulware then explained, "When I saw this darkened object, not knowing what it was, desiring more time and sea room for observation, I gave a lefthanded rudder." At the time of the left rudder no two-blast signal was sounded by the PC-451. Boulware's excuse was fear that the small ship he had sighted was an enemy submarine. It is difficult to accept

this as a plausible explanation, for with the PC-451 proceeding in a lane customarily used by northbound civilian vessels, Boulware must have been informed, as was Mackel, that the ship sighted was proceeding on a parallel opposite course—a course identical to that customarily followed by northbound vessels in that area. With his special training for sighting objects under darkened conditions, he must have been informed from the outline and contours of the ship he sighted that it was not a submarine. A prudent navigator under such conditions should have concluded that, in the circumstances, he was encountering a northbound civilian vessel. But, even if we assume that Boulware was uncertain as to the character of the ship sighted, it is difficult to understand why if he believed he was in the immediate presence of an enemy submarine, in time of war, he did not then sound aboard the PC-451 a battle signal, calling all men to quarters. I reject Boulware's excuse for not sounding the two-blast signal when the left rudder order was given, and I find the PC-451 at fault for not so doing. I also find the PC-451 at fault for executing a standard left rudder when the meeting situation was head on, calling for a full right rudder.

After the left rudder order had been given and the wheel put over, Boulware testified that, standing near the helmsman, he kept his eye "on this darkened object and just about the time the helmsman had the wheel to indicate 20 degrees left, I saw lights come on the darkened object. * * * I saw immediately what it was—a small ship, tugboat type—swinging very rapidly to the right and crossing my bow. Realizing that with him running rapidly across my bow I would be absolutely unable to prevent a collision, with left rudder. * * * I gave right full rudder * * * full astern and ordered one blast on the siren which was to sound collision quarters. The wheel was hard right when we struck. * * * The engines had stopped but not yet reversed; we struck the Nancy Moran on her port side approximately amidships * * * she was perpendicular to the line of our keel at an angle of 90 degrees with our axis."

 The PC-451 did not switch on her lights until after the collision although there was a master switch on the bridge close at

hand. She did not show her lights when she changed her course with left rudder, nor when she again changed course to right full rudder. In this I find the PC-451 at fault. Prudent navigation required that the lights of the PC-451, under these special circumstances, be shown, if not upon the original sighting of the Nancy Moran at least when the left rudder order was given.

When we compare the testimony of Boulware on direct examination with his testimony on cross-examination and with the other evidence before us, we find the following:

(1) when cross-examined, Boulware testified that instead of standing by the helmsman close to the wheel after the Nancy Moran had been sighted and he had given the order of left rudder, he again went to the starboard wing doorway and looked out, and that it was then that he saw the lights go on on the Nancy Moran, that he then returned to the wheel and gave the helmsman the full right rudder order. This is in conflict with the deposition of Swindal, the helmsman, who testified that Mackel, the starboard bridge wing lookout, ran into the pilot house to report the first sighting of the Nancy Moran and that Boulware "ran out there and took a look and he came in and gave me a 20 degrees left rudder," and "that he run up there again and he came back and he said 'full right rudder.'" When Boulware was asked, "There is no obstruction to your seeing through the pilot house, through the wheelhouse window?", he replied, "No, sir." Whether Boulware did in fact go twice out on to the starboard bridge wing losing critical seconds or whether he went twice only to the doorway leading to the bridge wing, we do not know because of this conflicting testimony, but why in either event he found it necessary to leave his position by the helmsman where he had a clear and unobstructed view, on these two occasions to go over to the doorway and look out is difficult to understand;

(2) aboard the Nancy Moran no whistle from the PC-451 was heard, in fact, Andersen, the master of the Nancy Moran testified that no whistle was sounded by either vessel before the collision. This is in conflict with Boulware's testimony that one long blast was given by the PC-451 prior to the collision. On this issue the evidence brings Boulware's testimony into serious question. The quartermaster's rough log kept by Mackel contains the following entries:

"0545– Collision with tug Nancy Moran"

"0546– Stopped, sounded collision."

It will be noted that the entry "Stopped, sounded collision" was made alongside of the notation "0546"—one minute after collision. It was crossed out by Mackel within one hour after the collision. When we attempt to fix the time at which it was done, we come to the strange entry in the rough log concerning the weather. The testimony of Mackel was that this was an unusual entry, since weather entries were usually made in the weather log, and that this entry was made after an entry of 0632 of the same morning, at the bottom of the page. There is reason to infer that the notation "0546" was crossed out at the same time that unusual entry of the weather was made, and that was after 0632—47 minutes after the collision. Noting this entry, which was neither timely nor spontaneous, we find that it reads:

"During collision, sky clear, pitch dark with very poor & dark background causing visibility to be very poor."

Just why this entry was made and the purpose it was intended to serve in the quartermaster's rough log we do not know, but it has cast doubt on the accuracy of both Boulware's and Mackel's testimony;

(3) then too, Boulware's testimony on the angle of collision is not only in conflict with that of Andersen, master of the Nancy Moran who gave the angle of collision at 5 to 6 points and that of mate Johansen of the Nancy Moran who set it at about 6 points off the bow of the Nancy Moran, but it is also in conflict with the deposition of Swindal, helmsman of the PC-451. Swindal's diagram annexed to his deposition shows the angle of collision to be approximately 6 points, as testified to by Andersen and Johansen of the Nancy Moran, and not 90 degrees as testified to by Boulware.

The navigation of the PC-451, under the circumstances, was improper and the PC-451 is found at fault.

*The Failure of the PC-451 to use Sonar Prudently and Effectively.*

The PC-451 was equipped with the then current model (1941) of "sonar" or sound gear, known as model WAA, type QC. This apparatus was made up of two parts consisting of an echo ranging and listening equipment and an echo sounding gear. The echo sounding device was used for ascertaining the depth of water under a vessel and to detect the presence of reefs, wrecks and other dangers to navigation. With this part of sonar we are not concerned as it is not here involved.

The echo ranging and listening device was designed for three principal functions: (1) to obtain the range and direction of neighbouring vessels, mines, buoys, etc.; (2) to detect the noise caused by the propellers and other moving apparatus of a neighbouring vessel so as to ascertain its direction; and (3) to telegraph communications between vessels similarly equipped. We need consider the first two functions only.

Although the echo ranging and listening equipment was built into one machine controlled by one operator, it functioned separately—one phase at a time—as determined by the manipulations of the controls by the operator.

The PC-451 did not have any radar equipment aboard. Sonar differs from radar, insofar as we are concerned, in that the latter functions primarily in a field on the surface or above water, while sonar's scope of effectiveness is primarily sub-surface and under water.

At the time of the encounter of the vessels and for five minutes before, the PC-451 was using the listening phase of sonar. The echo ranging phase had not been used. The Nancy Moran claims the PC-451 was at fault in her failure to use echo ranging, contending that it was at the time best suited as an aid to navigation to give advance warning of the presence of an oncoming vessel. The merits of this claim involve a consideration of the nature and effectiveness of both these phases of sonar, and of the purpose for which sonar was designed and installed on naval vessels, particularly on the PC-451.

Both the echo ranging and listening projectors are combined in a single unit, spherical in shape which is lowered by an electrically operated hoist train mechanism from a sea chest in the ship's hull to a position of about 20 inches below the base line of the ship. The projector then is rotated for echo ranging and listening in the desired direction. By the echo ranging phase electrical impulses or pings are sent out which traveling under water may encounter subsurface objects, such as the hull of a vessel, in which event they will return as echoes and be picked up by the projector of the sending ship. Whether or not the pings return to the sending ship after striking a sub-surface object depends on many variables—the temperature of the water, its turbulence, the area of the pings' encounter, the angle at which they strike the sub-surface object and their consequent angle of return, the distance the pings travel before striking and the density of the material of the sub-surface object.

The effectiveness of echo ranging at night is impaired by two distinct disadvantages, first, that at night submarines are generally found on the surface and consequently the target of the pings decreased since the area of the surface of the submarine under water has been diminished, and, second, that the submarines can hear the pings at much greater distances than the return echo can be heard aboard the sending ship.

By the listening phase, propeller, water and other noises of vessels may be picked up on the projector and amplified. The advantages of using the listening phase at night are due to the disadvantages affecting echo ranging as above enumerated, which are not met when the listening device is used, as well as to the fact that when the submarine is on the surface at night it is proceeding at a relatively high speed, making it possible to pick up and distinguish the submarine's propeller noises with greater ease, and that a designated arc of detection for sweeping can be covered much more quickly by the listening phase than by echo ranging, where the return of the pings must be awaited before an advance station can be covered.

But, the listening phase also has its disadvantages, for with it it is very difficult,

if not impossible, to determine the range of the submarine, and also the propeller and water noises coming from the hull of the sending ship itself, if proceeding at speed, interfere with the propeller sounds and noises of other ships which might be in the neighbouring areas.

Just which phase of sonar is most effective at night is the occasion of great difference of opinion on the part of those trained and expert in its use. Navy doctrine and instructions in 1941, however, directed that under circumstances as here presented, the listening device was to be used in preference to the echo ranging, although the matter was left largely to the discretion of the commanding officer.

No warning of the approach of the Nancy Moran was received over the listening phase of sonar aboard the PC-451. It is contended on behalf of the Nancy Moran that it was a fault on the part of the PC-451 to use the listening phase instead of echo ranging. It is argued that had the latter been used the PC-451 would have been warned of the approach of the Nancy Moran even before she had been sighted. This conclusion is entirely speculative and is not based upon any evidence presented.

I find that the sonar equipment was designed and intended primarily for use on vessels of war as an instrument of warfare, and not as an aid to navigation. Whether the use of one or the other phase of sonar is proper and prudent, at any given time, must be left entirely to the discretion of and determination by the Navy and its officers in command of vessels equipped with it. I find that military considerations only should dictate which particular phase is to be used. The sonar equipment aboard the PC-451 was being operated in accordance with the then current teachings, instructions and doctrines of the United States Navy based upon its wartime experiments and experience. It would be presumptuous for any court to dictate the conditions under which an instrument of warfare was to be used by naval vessels in time of war.

The principle of law that prudent navigation involves taking advantage of all the safety devices at hand (The Australia Star, D. C., 74 F.Supp. 145, 1947 A.M.C. 1630), is not applicable to the use of sonar, as it is a device designed primarily for submarine detection and for warfare. The physical limitations of the effective field of operation of sonar are far too great to permit its classification as an aid to navigation.

*Jurisdiction of the Court over the PC-451—*

The Government contends that the libel must be dismissed on the ground that it does not properly lie within the provisions of the Public Vessels Act of 1925, 46 U.S. C.A. §§ 781–790, since the Act does not expressly include or exclude claims arising out of the *combatant activities of a naval vessel in war time.*

Concededly, there is no express exception in the Public Vessels Act in respect to claims arising out of "combatant activities." The contention rests not upon what the Congress wrote, but upon what we are asked to presume it would have written if it had, in fact, considered this point (which apparently it did not even discuss). To follow this argument would result not in statutory construction, but in judicial legislation. Crooks v. Harrelson, 282 U.S. 55, 59, 60, 51 S.Ct. 49, 75 L.Ed. 156.

In Canadian Aviator, Ltd., v. United States, 324 U.S. 215, 65 S.Ct. 639, 643, 89 L.Ed. 901, a similar attempt was made to restrict the plain meaning of the Public Vessels Act. The Court held that "such a narrow interpretation of the Act is not justifiable" and further "we think Congressional adoption of broad statutory language authorizing suit was deliberate and is not to be thwarted by an unduly restrictive interpretation." 324 U.S. at page 222, 65 S.Ct. at page 643.

The sole basis of this argument is argument. There is no evidence in the record to support the premise that the PC-451 was engaged in "combatant activities." In truth, she was not.

The testimony of her commanding officer is pertinent here. He testified that on December 19, 1941, the PC-451 was ordered out of Key West to hunt for a submarine and that after a brush with "what we thought was the submarine" she returned to port on December 22, 1941. On Decem-

636

ber 24, 1941, the PC-451 was ordered out again "to patrol the Florida Straits against submarines and to meet and escort to the southward a troop convoy." It was while the PC-451 was on this mission that the collision occurred. The PC-451 and the USS Biddle had hoped to meet the convoy before dark on December 25, 1941, and "at dark we turned south and proceeded down the Florida Straits at what we assumed would be the speed of this troop convoy because we did not want the convoy to pass us in the night, and we also wanted to clear the sea lanes ahead of any submarines that we might contact."

The PC-451 had not come in contact with a submarine or any other enemy vessel. There is no testimony to indicate that the enemy was at the time in the immediate area. Certain it is that the PC-451 had not made contact with the enemy; nor was she in "hot pursuit" of, nor in actual combat with the enemy. The most that can be said is that she was proceeding merely to keep ahead of an expected and awaited convoy and the only enemy submarines in contemplation were those she "might contact"—which was wholly speculative.

The only difference between Canadian Aviator, Ltd., v. United States, supra, and the instant case is that there the YP-249 had met her convoy and was escorting it, whereas here the PC-451 had not met her convoy.

In this connection it is interesting to note the provisions of the Federal Tort Claims Act, 28 U.S.C.A. §§ 941–946,[1] which excludes from the authorization to sue the Government torts arising out of combatant activities. Construing this statute the court in Skeels v. United States, D. C., 72 F.Supp. 372, wrote at page 374:

"It is believed that the phrase was used to denote actual conflict, such as where the planes and other instrumentalities were being used, not in practice and training, far removed from the zone of combat, but in bombing enemy occupied territory, forces or vessels, attacking or defending against enemy forces, etc. In practice or training remote from combat, there would be the same opportunity for care and caution as

in peace time; whereas, in actual fighting, the attention and energies of the military personnel would be directed and devoted to the destruction of the enemy and its property, as well as to the protection of the lives of their own forces, citizens and property by the use of force immediately applied."

See also, Watts v. United States, D. C., 123 F. 105, where suit was brought in the Admiralty under a special act of the Congress.

I conclude that this suit in the Admiralty is properly brought against the United States under The Public Vessels Act of 1925, 46 U.S.C.A. §§ 781–790.

An appropriate decree giving effect to the foregoing findings shall be settled upon notice.