Complaint of FLOTA MERCANTE GRANCOLOMBIANA, S.A., as Owner of the M/V REPUBLICA DE COLOMBIA, for Exoneration from or Limitation of Liability, and related case Nos. 72 Civ. 3987, 72 Civ. 4079, 72 Civ. 4936, 72 Civ. 5450, and 73 Civ. 1483.

No. 72 Civ. 4036–CLB.

United States District Court,
S. D. New York.

March 30, 1977.

Burke & Parsons, Max Taylor, New York City, for claimant.

Bigham, Englar, Jones & Houston, Douglas A. Jacobsen, Gifford, Woody, Carter & Hays, Charles W. Trowbridge, Hill, Rivkins, Carey, Loesberg & O'Brien, Raymond P. Hayden, Bernstein, Weiss, Parter, Coplan & Weinstein, Charles W. Lake, New York City, for claimant/cross-claimant.

Paul C. Matthews, Jr., New York City, for intervenor.

Burlingham, Underwood & Lord, Kenneth H. Volk, New York City, for plaintiff.

## FINDINGS AND CONCLUSIONS

BRIEANT, District Judge.

This admiralty action arises out of a collision which occurred on September 14, 1972 off Cape Hatteras, North Carolina, approximately 12 miles north of Diamond Shoals Light. The vessels involved were the M/V REPUBLICA DE COLOMBIA ("COLOMBIA"), which is owned and operated by Flota Mercante Grancolombiana, S.A. ("Grancolombiana"), and the S.S. TRANSHAWAII ("TRANSHAWAII"), which at that time was owned and operated by Hudson Waterways Corporation ("Hudson"). The ships remained locked together for more than 24 hours, with the COLOMBIA suffering such extensive damage that she had to be towed to Newport News, Virginia.

One week later, on September 21, 1972, Grancolombiana filed a petition for exoneration from or limitation of liability pursuant to 46 U.S.C. § 183. Hudson filed a claim seeking to place the entire blame for the collision on the COLOMBIA and opposing any limitation of liability. Thereafter, the owners of cargo laden on board the COLOMBIA, Amax Copper, Inc., Leon Taffae Co., Inc., Standard Fruit and Steamship Co., M. Trombetta and Sons, Inc. and Darik Enterprises ("Cargo Claimants") filed claims against the COLOMBIA in the limitation proceeding, and also brought separate actions against the TRANSHAWAII for all economic losses sustained by them. The Cargo Claimants' separate actions have been consolidated with the limitation proceeding for purposes of trial.

While the above-named parties were engaged in pre-trial discovery, the helmsman of the TRANSHAWAII, one Nicholaos Hrysaghis sought leave to intervene in these proceedings. He claims against whoever is ultimately held responsible, alleging that he sustained personal injuries in the collision. In the interests of justice, leave to intervene was granted on October 2, 1973.[1]

By stipulation of the parties, incorporated in Paragraph VIII of the Pre-trial Order, dated June 17, 1974, all issues as to damages have been deferred and will be held for a separate trial should liability be found. A non-jury trial was then held before me limited to the issues of liability more fully described below.

The COLOMBIA seeks exoneration and claims that the entire fault for the accident lies with the TRANSHAWAII. If complete exoneration is denied, then the COLOMBIA seeks in the alternative, to limit her liability upon familiar principles to the value of the ship at the conclusion of the voyage and freights then pending. *The City of Norwich*, 118 U.S. 468, 6 S.Ct. 1150, 30 L.Ed. 134 (1886).[2] Hudson and the Cargo Claimants assert that the COLOMBIA was at

---

1. Also, see this Court's decision dated March 30, 1977, granting Chief Engineer Timothy Sullivan's motion to intervene in these proceedings to assert a claim for personal injuries.

2. Grancolombiana has moved to reduce the limitation fund from $1,287,247.07 to $189,247.07. It claims that the repair costs greatly exceeded the first estimates, and that COLOMBIA was in effect a constructive total loss when she was towed into the harbor at Newport News, Virginia. In view of the Court's findings of fact and conclusions of law which follow herein, this motion to reduce has been denied as moot by an order of the Court dated March 30, 1977.

fault in the collision, and also that her owner should be denied the benefit of the limitation of liability statute, because the vessel was unseaworthy when she broke ground on this voyage. The Cargo Claimants also assert that the TRANSHAWAII was partly responsible for the mishap and seek to recover against her as the non-carrying vessel under long-established case law. *The Atlas*, 93 U.S. 302, 23 L.Ed. 863 (1876).

Finally, should limitation be denied, and should the COLOMBIA be required to pay damages to the TRANSHAWAII, Grancolombiana has counterclaimed under Rule 13, F.R.Civ.P., for a contribution in general average against the Cargo Claimants.

After the issues as to liability were fully submitted and pending decision, the Supreme Court decided the case of *United States v. Reliable Transfer Co.*, 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251 (May 19, 1975). In that historic decision, the court overruled a 120 year old doctrine of *The Schooner Catherine v. Dickinson*, 58 U.S. (17 How.) 170, 15 L.Ed. 233 (1855), and ruled that henceforward damages in a collision case should be divided between the parties in proportion to their relative degrees of fault for the accident. Subsequent to that decision, and at this Court's suggestion, the trial record here was reopened, and the parties submitted supplemental post-trial memoranda. However, no additional evidence was proffered by any party following the enactment of the new *Reliable Transfer* rule of damages, which is discussed in greater detail below.

*The Vessels*

The COLOMBIA is a steel motor vessel, 11,656 gross, 6,812 net and 12,253 summer deadweight tons of Colombian registry. She is 554 feet, 7 inches in length, 69 feet, 5⅞ inches in maximum breadth, and 42 feet, 3⅞ inches in molded depth. She was built in Hamburg, Germany in 1964 and is powered by a 14,400 brake horsepower diesel engine. On September 11, 1971 and prior to the accident, she had been surveyed by the American Bureau of Shipping and

retained in the A–1E class, the highest relevant available rating.

The TRANSHAWAII is a steam turbine containership of United States registry. Although she began life as a C–4 troop transport, in 1968 and 1969 she was converted and rebuilt by Maryland Shipbuilding & Drydock Co. of Baltimore. TRANSHAWAII weighs 13,487 gross and 9,630 net tons, is 632 feet, 10½ inches in length, 71 feet, 6 inches in maximum breadth, and has a molded depth of 43 feet, 6 inches.

It is important to describe COLOMBIA's steering mechanisms in some detail. There were three separate and independent electrical methods for steering the vessel from the bridge. By means of a switch on the console below the wheel, the helmsman selected the system which he desired to use. One method was the automatic gyro pilot, which was operated by adjusting a dial on the console to point to an intended compass course, following which the steering device automatically tracked the gyro compass. The automatic gyro pilot was generally used for cruising at sea and was in operation immediately prior to the events leading up to the collision.

The second steering system available to the helmsman on the bridge was the manual, or hand-electric mechanism. By turning a vestigial wheel, consisting of three spokes and an incomplete ring, either to the left or right, the helmsman activated an electronic mechanism which altered the vessel's course in the same direction. This hand-electric system was used in tight situations such as narrow channels and in docking.

A third method was also available to steer the ship from the bridge. This mode consisted of two pushbuttons on the console. The pushbutton on the right when activated would steer the vessel to starboard and continue to move the rudder as long as pressed, while the left pushbutton operated in the opposite fashion.

On the COLOMBIA there were two separate electric cables which extend from the aforementioned console on the bridge to the steering engine locker in the engine room.

One of these electric cables ran down the starboard side of the ship, and the other ran down the port side. By means of a cable selector switch, one could select the particular cable to be used at any particular moment. Thus only one cable would be used at a time and under normal circumstances on the COLOMBIA, this was the starboard cable. The two cables were completely independent on one another, so that a severing, grounding or short-circuiting in one cable would not affect the operation of the other.

In the steering engine locker, the impulses were received from the bridge console by means of the particular electric cable then in use. When all was operating correctly, these impulses activated the electric steering engine, which moved the rudder through hydraulic pumps in accordance with the signals it received. The steering engine itself was an electrohydraulic type with rotary activator on the rudder stock. It is important to note that transmission of electrical impulses over two separate circuits was necessary in order to execute a course change from the bridge; one circuit transmitted the impulses from the bridge to the steering engine room, and the second thereafter energized the steering engine hydraulic pumps which moved the rudder in accordance with the signals received.

There were also auxiliary means of steering the COLOMBIA. It was possible for an oiler or engineer in the steering locker, directed by telephone or otherwise, by means of a hand clutch, to uncouple the machinery which permitted steering from the bridge, and, after engaging a second clutch, to position the rudder manually by turning a so-called "trick wheel." A rudder angle indicator was available on the bridge which showed the actual angle of the rudder at all times. The same information was also available in the steering engine locker, and thus an oiler or engineer in the locker could set the rudder in any position desired, by manual operation from that station.

In addition, the vessel had a manually operated, mechanical steering wheel located aft on the boat deck approximately fifty feet from the stern. Even assuming a complete electrical failure on the COLOMBIA, a seaman could steer the ship by rotating this wheel, if the electric steering engine were first uncoupled in the locker and the manual wheel clutch was then engaged. Since this seaman would not have a clear line of vision, he would need the assistance of someone on the bridge to transmit directions by means of a hailing horn or otherwise.

To summarize then, an officer on watch faced with the loss of steering on the bridge could telephone the engine room and give an order to move the rudder to the desired position by turning the trick wheel in the steering locker manually; or, he could station a seaman at the steering wheel on the boat deck, and by bullhorn, megaphone, telephone or any other method, he could instruct him as to how to steer the vessel, as long as the steering engine clutch was first uncoupled and the mechanical wheel clutch was engaged. Thus, failure of the electrical steering mechanism did not necessarily deprive the vessel of the ability to steer.

While it is true that a number of revolutions of the trick wheel, or the manual wheel, would have been required to effect a significant correction in COLOMBIA's course, I find there was significant time to do so, and such an effort, if made promptly, alone or in conjunction with a reduction in speed, would have averted the collision.

The electrical steering system, manufactured by the Allegmeine Elektricitats-Gesellschaft Schiffbau of West Germany ("A.E.G."), is commonly in use on many vessels of all flags. When used, as on the COLOMBIA, in conjunction with the Sperry Gyropilot Steering Control, manufactured by the Sperry Gyroscope Co., Ltd. of England, this steering system is generally accepted as adequate and proper for a vessel in the highest class.

*The Collision*

The TRANSHAWAII had departed from San Juan, Puerto Rico late in the evening of September 11, 1972, and on the afternoon of the 14th, she was proceeding towards

Baltimore with a cargo of 200 to 300 containers. As was his custom, Captain Morin, Master of the TRANSHAWAII, had been on the bridge since 1100 hours in anticipation of a landfall off Cape Hatteras. In the mid-afternoon, TRANSHAWAII was proceeding on a course of 340° true, and turning about 82 rpm, which gave her a full-ahead sea speed of about 17½ knots.

The COLOMBIA had left Jacksonville, Florida at 1655 hours on September 13th, bound for Baltimore, Maryland with, *inter alia*, a bulk cargo including bananas. On the afternoon of the 14th, COLOMBIA was steaming towards Diamond Shoals Light off Cape Hatteras on a heading of 047°, at a full sea speed of 19.2 knots (112 rpm). At about 1520 hours the Master of the COLOMBIA, Captain Kleindl, came onto the bridge and first observed the TRANSHAWAII, about 10 miles distant off the starboard bow. The weather was clear and warm, the visibility was excellent, and the seas were calm.

At 1600 hours the watch on both ships changed, with Chief Mate Gabriel Rodriguez taking over on the bridge of the COLOMBIA and Second Mate Claude Chaffin assuming the same position on board the TRANSHAWAII. The second mate on the COLOMBIA remained on the bridge until a course change begun at 1605 hours was executed and completed at 1610. This change was accomplished by switching the steering mechanism from automatic gyro to hand electric, and then turning the vestigial wheel on the console. The COLOMBIA then steadied on a course of 357° and the steering was switched back to automatic gyro by means of the switch on the console. Before he left the bridge, the second officer wrote the new heading of 357° on a blackboard on the bridge in front of the console.

The COLOMBIA's magnetic heading, as shown by the magnetic compass located on the upper deck and visible in the wheelhouse by means of a periscope, was then 005° Mag., and this heading was also written on the blackboard at that time.

The reason for this course change was that at about 1610 hours the COLOMBIA came abeam of Diamond Shoals Light and it was necessary to change from a northeasterly to a northerly course in order to make the next mark.

Meanwhile on the TRANSHAWAII, the engineer had begun to blow tubes at 1600 hours, as was his custom. This lasted about 15 or 20 minutes and effected a slight reduction of the revolutions per minute, and speed. At about the time the COLOMBIA changed course behind her, Captain Morin ordered the helmsman, Hrysaghis, to alter TRANSHAWAII's course 20° to the right, from 340° to 000°. This order was carried out at 1610 hours. At the moment when the ship steadied on a north heading, Chaffin fixed the position of the TRANSHAWAII at two miles north of Diamond Shoals Light.

Between 1610 and 1625 hours, the COLOMBIA began to overtake the slower TRANSHAWAII. COLOMBIA proceeded to come up on the port quarter of the containership. As she began to close, Captain Kleindl swung COLOMBIA underneath the stern of the slower vessel, and by executing a course change to 005°, he was able to come up on the starboard side of TRANSHAWAII to where he could proceed in a safe fashion on an approximately parallel course for Baltimore. This maneuver was accomplished at about 1625 hours without incident or difficulty, and shortly thereafter, COLOMBIA came abeam of the containership. Both Captain Morin and Mate Chaffin had been observing the COLOMBIA's movements from the starboard wing on the bridge of their vessel. At the moment the vessels were abeam, Captain Morin took a radar reading which placed the COLOMBIA at a lateral distance of between .5 and .6 of a mile.

After she came abeam, Captain Kleindl, using the trim control knob, made a slight course change so that by 1632.4 hours COLOMBIA was on a 000° heading of true north. At that point, COLOMBIA had overtaken and was free and clear of TRANSHAWAII. She was headed towards buoy R–10, 15 miles away. When COLOMBIA had proceeded ahead by about a half mile

and both vessels were in their respective tracks, about three-quarters of a mile apart from each other measured by a straight line between the bow of the TRANSHAWAII and the stern of the COLOMBIA, Captain Kleindl was satisfied that his vessel was clear. He then left the bridge, to collect some personal laundry that was drying on the upper deck near the magnetic compass.

First Mate Rodriguez was thus left alone on the bridge, with the steering set on automatic gyro pilot. The quartermaster, who would normally take the wheel while the officer stood watch, was doing maintenance work on the boat deck below the bridge.

Rodriguez, a resident of Bogota, Colombia, had gone to sea for more than fifteen years. He graduated from the Naval School in Cartagena, Colombia in 1960, after successfully completing a four year course. He had sailed on the COLOMBIA and her sister ships in the Grancolombiana fleet for more than four years beginning in 1968 as a second officer. In 1970 he received his first officer's license, and had served continuously on the COLOMBIA as the Chief Mate from January 1972 until the day of the collision.

Rodriguez testified, and I find that shortly after the Captain left the bridge he was observing the reflection of the sun on the water. (The sun was in the west, and thus on COLOMBIA's port side.) After a few moments he noticed that the position of the sun in the water seemed to change, and realized that the vessel seemed to be falling off to port. He checked the gyro compass, which still showed the vessel's heading at 000 degrees, however, he also checked the magnetic compass, by means of the periscope in the wheelhouse. This gave him a reading of 005 degrees Magnetic, when it should have read 008 degrees. Thus Rodriguez had apparently detected a 003 degree falling off to port, and an unexplained difference between the gyro and the magnetic compasses. This was confirmed when Rodriguez also noticed that the rudder angle indicator at the bridge was showing that the rudder was turned between 10 and 15 degrees to port, when it should have been midships.

To bring COLOMBIA back on course, he moved the steering control switch from automatic to manual, and put the wheel all the way to the right. The rudder did not respond, and in fact kept going further to port. He then switched to the pushbutton steering mode and pressed the button for a right rudder. Still the rudder gave no response, and in fact now fell all the way over to port, between 30 and 35 degrees left rudder on the rudder angle indicator. From the time Rodriguez first noticed the falling off until he completed this first round of manipulations he testified that between 60 to 90 seconds had passed. It well may have been a longer time interval.

Rodriguez then walked out onto the port wing of the bridge in order to see where the TRANSHAWAII was. Upon ascertaining that she was holding to her pre-existing course and speed, he returned to the wheelhouse and once again repeated his previously unsuccessful efforts to steer the ship from the console. He attempted again to use the emergency pushbutton system, again without response, and after switching over to the manual mode, swung the wheel over hard right again. Still the rudder did not move from its hard left position. One more time he tried the pushbutton mode (without changing the cable selector switch), but with no success. This second round consumed about 90 seconds. There was no reasonable basis for trying a second time, having failed on the first. This useless effort wasted precious time.

Up to this point, no attempt had been made by Rodriguez to alert anybody else of the fact that the COLOMBIA was rapidly sailing into danger. Her course was turning rapidly to the left. Rodriguez had not communicated with the engine room, to have the rudder brought back to the right by manual operation of the trick wheel. Nor did Rodriguez make any effort to obtain the assistance of a seaman to engage and operate the mechanical wheel on the boat deck. Either of these procedures would have restored steering control to the

vessel, and, if taken as soon as the failure occurred, would have avoided the collision.

Instead, Rodriguez apparently panicked, and running out again onto the port wing, merely yelled for the Captain. At last, returning to the wheelhouse after more than three minutes had elapsed since the steering failure had first been noticed, he sounded the ship's whistle.[3] COLOMBIA's radio operator, Giron, then came onto the bridge to report to Rodriguez that his power had failed. Rodriguez told him that there was going to be a collision. Then Rodriguez finally went to the engine telegraph and put the engines on stop. About twenty seconds later, the engine room answered the telegraph order. Between 10 and 15 seconds after the engine room responded and considerably less than one minute after the whistle had first been blown, the collision occurred, about 12 miles north of Diamond Shoals Light, at 1644 hours.

The evidence from the vessel's course recorder and the testimony shows that it had been approximately four minutes and twenty seconds from the time the steering failed and the rudder began to move to the left, until the collision.[4] The ship had in the meantime turned 90 degrees to port and was heading 270 degrees at the moment of impact. The TRANSHAWAII's bow struck the COLOMBIA on her port side at a right angle, approximately 180 feet from the stern.

*The TRANSHAWAII's Part in the Collision*

Meanwhile, the TRANSHAWAII had continued on at a speed of about 17 knots on a heading of 000 degrees. Both Mate Chaffin and Captain Morin had been on the starboard wing of the bridge, and had seen

the COLOMBIA maneuver without difficulty and pass their vessel. After COLOMBIA was about two or three ship lengths ahead of their starboard bow, both men came back into the wheelhouse where the helmsman, Hrysaghis, was steering the vessel manually, and watching the compass. The Captain then told Chaffin that he was leaving the bridge briefly.

It was the custom and practice on TRANS-HAWAII, when sailing in coastal waters, to fix and plot the ship's position every fifteen minutes. As it was now coming up to 1645, Chaffin proceeded to measure the distance from the ship's bearing in relation to Diamond Shoals Light. To make the calculation, Chaffin first went to the radar in the wheelhouse which was located on the starboard side behind the helmsman. In a couple of seconds he was able to determine that the Light was 12 miles distant astern of TRANSHAWAII. Chaffin then went out onto the port wing, and using the azimuth bearing circle on the gyro repeater, estimated a bearing of approximately 180 degrees for the same light. To take this visual bearing, Chaffin had to face south, looking off TRANSHAWAII's stern.

Chaffin testified at his deposition that this whole process of going out on the port wing and taking a bearing took only 10 to 15 seconds. The Court believes that the time period involved was slightly longer, perhaps 25 to 40 seconds. However long it took, the evidence is clear that during this time period no one was keeping a lookout forward. The helmsman was concentrating on watching the gyro compass and keeping the ship on her course of 000 degrees.

After taking the visual bearing, and while still out on the port wing, Chaffin turned around to see what was ahead. He

---

**3.** Chaffin on the bridge of the TRANSHAWAII testified at his deposition that he heard the tail end of COLOMBIA's whistle at the moment that he entered the wheelhouse. This was no more than 40 seconds before the collision and at least three minutes after Rodriguez first noticed that the COLOMBIA was falling off to port.

**4.** During these crucial four minutes Captain Kleindl had been on the upper deck above the wheelhouse turning his laundry so it could dry

on the other side. While glancing ahead he happened to notice a seaman descending quickly from one of the kingposts, and almost simultaneously he heard a cry and the whistle. He then ran over to the port side. Seeing that the TRANSHAWAII was coming up fast off the port bow, he realized that a collision was imminent. He ran back to the starboard side and started for the bridge, but before he could get there, the collision occurred.

then noticed for the first time that CO-LOMBIA was veering sharply to the left. According to his testimony, COLOMBIA seemed to hesitate for a moment as if she were correcting her course, but then proceeded to come over hard left across the TRANSHAWAII's bow.[5] Chaffin yelled and ran for the wheelhouse door, about twenty feet away. As soon as he got inside, he heard the tail end of a whistle from the COLOMBIA. At this point, with the COLOMBIA almost dead ahead, he called out for his Captain, leaned hard on the whistle, and told the helmsman to give the vessel a hard left rudder. Just as he turned to put the engines on stop, Captain Morin, who had been below and had seen the kingposts of the COLOMBIA fast approaching through a porthole, came bursting through the interior door of the wheelhouse and reached for the general alarm. The Captain asked where the rudder was; Chaffin told him hard left, and the Captain then moved over to the engine telegraph and put the engines on stop. Only seconds later, after the Captain yelled "hang on," the bow of the TRANSHAWAII struck the port side of the COLOMBIA aft of amidships.

From the time that Mate Chaffin first saw the COLOMBIA veering to the left until the moment of impact, there was a period of between 30 and 45 seconds. At this time, it was too late for any effective action aboard TRANSHAWAII to avoid the collision. Although Chaffin had ordered hard left about 15 seconds before the collision, and the Captain had put the engine telegraph on stop a few moments before impact, TRANSHAWAII was proceeding at a full sea speed of approximately 17 knots and was still on a 000 degrees heading when she rammed into the COLOMBIA.

## Afterwards

The damage done to the COLOMBIA by the collision was considerable. The bow of the TRANSHAWAII penetrated deep into

the engine room of the freighter. The COLOMBIA's engineer was never found after the accident and presumably lost his life. The ships remained locked together and there was a fire in the COLOMBIA's engine room. Captain Kleindl feared an explosion and ordered the crew to abandon ship. Except for one or two people, everyone passed over by line onto the deck of the TRANSHAWAII. The COLOMBIA soon started taking on water through the hole in her hull, and began to list to starboard. All efforts to disengage the two vessels failed and they stayed together until the evening of the next day. Finally, at 2112 hours on Friday, September 15th, with the aid of the Tugboat Captain Henry, COLOMBIA was pulled free and towed to Newport News, Virginia. The TRANSHAWAII, although badly damaged at her bow, was able to proceed under her own power to Baltimore, but suffered no cargo damage.

When the COLOMBIA reached Newport News, an effort was made to salvage some of her cargo, but because of the influx of water and the consequent loss of refrigeration to the hatches, the cargo was either a total loss (in the case of the bananas) or considerably diminished in value.

## Fault on the Part of COLOMBIA

The steering failure on the COLOMBIA occurred at approximately 1640 hours, or slightly more than four minutes and 15 seconds prior to the collision. Rodriguez, the officer charged with the responsibility for her navigation, discovered the steering failure almost immediately. During the crucial three and one half minute period following awareness of the steering breakdown, First Mate Gabriel Rodriguez failed to exercise proper seamanship and as a result greatly contributed to the collision with the TRANSHAWAII.

Rodriguez had been the deck officer on watch on August 13, 1972, a prior occasion,

---

5. I find that from the time shortly before Rodriguez observed the change in the sunlight on the water, until the moment of collision, some four minutes later, COLOMBIA's rudder moved gradually and steadily from ahead to 32½ degrees left rudder, where it stood at the time of collision. There is no factual basis for Chaffin's observation that COLOMBIA seemed to hesitate.

discussed *infra*, when COLOMBIA had lost all electrical power for a few seconds, following which, when power was restored, the rudder no longer responded to signals from the console on the bridge. Thirty-one days later, COLOMBIA's steering failed again. Although all efforts to restore steering from the bridge had failed on that prior occasion, Rodriguez proceeded during the crucial period following the instant failure to waste precious time tinkering with the inoperative steering controls. At the time, he knew that there was another vessel in close proximity to his own, and knew that he could steer by any of the alternate modes previously mentioned.

As Captain Pechulis, an expert called by Hudson Waterways, testified, Rodriguez's first priority as soon as he became aware of the loss of steering from the bridge should have been to warn the TRANSHAWAII that the COLOMBIA was out of command. Instead he set out to determine the scope of the problem by testing all of the different steering methods from the bridge, then uselessly repeating the effort. His efforts were aimed only at achieving a remedial solution to the problem while remaining totally oblivious to the danger which was fast approaching. Proper seamanship in such a situation, where vessels are traveling in close company and one ship is converging on the other, would have required an immediate visual or audible signal to the TRANS-HAWAII. Five short blasts on the whistle, while not obligatory under the International Rules of the Road, would have had the effect of alerting TRANSHAWAII to the fact that the COLOMBIA was out of command. Yet the evidence is undisputed that no whistle signal was given until less than a minute before the collision, and almost three and one half minutes after the steering loss was first noticed. See *Port Line v. United States*, 181 F.2d 365 (2d Cir. 1950) (Hand, L., J.). Nor was any visual signal, such as flying a flag with the code letter "D" ever made by the COLOMBIA. No effort to make radio contact with the other vessel was ever attempted, although COLOMBIA's radio had auxiliary batteries which allowed it to function even after a power failure on board the vessel. Knowing that the two vessels were sailing together in close quarters, approximately one half to three quarters of a mile apart, with TRANSHAWAII behind COLOMBIA and to port, and that COLOMBIA was falling off to port rapidly, at full speed, the failure to signal immediately was an inexcusable neglect of duty.

And, most damning of all, Rodriguez failed to exercise prudent navigation by not signaling stop on the engines as soon as he realized that the vessel was out of command. *The New York*, 175 U.S. 187, 207, 20 S.Ct. 67, 44 L.Ed. 126 (1899). Instead of continuing to sail into danger at a full sea speed of 19.2 knots, he should at least have put the engines on stand-by, slow ahead, or stop. The evidence shows, however, and I find, that Rodriguez did not put the engine telegraph on stop until after he had made two futile attempts to operate the console controls to make the rudder go to the right. This was at least three minutes and probably closer to three and one half minutes after he had first discovered that the vessel was falling off to port. Such a delay in signaling the engine room was not in accord with principles of proper seamanship, at least under the circumstances of this case.

Finally, and perhaps most important, it was negligence and fault of the highest order for Rodriguez, an experienced ship's officer, not to have taken any steps to steer the vessel manually. He knew that the COLOMBIA was sailing in close quarters with the TRANSHAWAII, and he was fully aware of the potential peril created for both ships by the failure of the electrical steering system. He was *conscious* almost immediately of the facts that his ship was falling off to port, and his rudder angle was going more and more to the left, and that he could no longer control the vessel's steering from the bridge console. Given these factors, it was imperative for him at this point to attempt to regain control of the vessel by steering it manually. As mentioned before, this could have been done either by placing a helmsman at the mechanical wheel located aft on the boat deck

and giving him directions by means of a hailing horn, or, more probably, in view of the emergency which he faced, he could have telephoned the engine room and ordered the engineer to disengage the clutch connecting the steering engine to the bridge console, and then after engaging the manual clutch, to give the vessel a hard right rudder by turning the trick wheel. Prompt action on either such alternative would have avoided the collision. Yet Rodriguez never even attempted to regain control over the vessel by manual steering, and in fact sailed on at full sea speed for more than three minutes after he knew that COLOMBIA was out of control.

■ In conclusion, I find that proper seamanship was not exercised in that no attempt was ever made to steer the vessel manually. Also, the delays in sounding a danger signal and in shutting down the engines are inexcusable. In failing to deal prudently with the situation presented to him by the failure of the steering console, and by the unexplained increasing movement of the rudder to the left, Rodriguez was negligent and his negligence was a proximate cause of the collision.

*Fault on the Part of TRANSHAWAII*

During the three and one half minutes following COLOMBIA's loss of steering, no one on the TRANSHAWAII's bridge was paying any special attention to the COLOMBIA. Both Captain Morin and Mate Chaffin had come in off the starboard wing. The Captain left the bridge temporarily and passed through the chartroom, below decks, after having a brief conversation with the radio operator. Chaffin busied himself with taking and plotting a fix for 1645 which was a few minutes away, and admits that he did not have COLOMBIA under visual or radar observation during this entire period. The only other person on the bridge was the helmsman Hrysaghis, who was steering the vessel manually and was concentrating on his course.

No individual was specifically designated as a lookout to keep the COLOMBIA, then about one half to three quarters of a mile distant, in view. The navigation experts at this trial have disagreed as to whether such a special lookout was required under the circumstances. The Court need not resolve this controversy, since all the experts do agree that in the absence of such a special lookout, it was required of the officer on duty that he keep COLOMBIA under careful observation at all times. Chaffin knew that there was no other lookout posted, and thus that it was his responsibility to watch the COLOMBIA's movements. The discharge of this duty should have been uppermost in his mind, because the proximity of the vessels created a potentially dangerous situation. This duty took precedence over the taking and recording of the 1645 fix. This latter duty required him to peer down into a radar scope, and to walk out onto the port wing twenty feet towards the stern of the vessel in order to use the azimuth bearing circle on the gyro repeater. Only after he finished getting the bearing did he turn around and see what the COLOMBIA was doing, and when his attention finally focused on COLOMBIA, the time within which he might have taken some action to avoid collision had already passed.

The duty to maintain a proper lookout is firmly established in both the admiralty case law and in the International Rules of the Road which governed the conduct of the ships here. In *The Ariadne*, 80 U.S. (13 Wall.) 475, 478, 20 L.Ed. 542 (1872), the Supreme Court stated:

"The duty of the lookout is of the highest importance. Upon nothing else does the safety of those concerned so much depend. A moment's negligence on his part may involve the loss of his vessel with all the property and the lives of all on board."

See also *Delaware L. & W. R. Co. v. Central R. Co. of New Jersey*, 238 F. 560 (2d Cir. 1916); *The O'Brien Brothers*, 258 F. 614 (2d Cir. 1919); *The Devonian*, 110 F. 588 (D.C. Mass.1901).

■ Lookouts must have no other duties to perform and ". . . must be persons of suitable experience, properly stationed on the vessel and actually and vigilantly

employed in the performance of that duty." *Chamberlain v. Ward*, 62 U.S. (21 How.) 548, 570, 16 L.Ed. 211 (1859). Especially relevant in this context is the statement of the Court in *The Montrose*, 47 F.Supp. 719, 724 (E.D.N.Y.1942):

> "A lookout cannot have his attention distracted by the performance of other duties while he is acting as a lookout, but must concentrate his attention exclusively on maintaining a proper lookout."

See also *National Bulk Carriers v. United States*, 80 F.Supp. 188 (S.D.N.Y.1948), *aff'd*, 183 F.2d 405 (2d Cir.), *cert. denied sub nom. Burns Steamship Co. v. National Bulk Carriers*, 340 U.S. 865, 71 S.Ct. 89, 95 L.Ed. 631 (1950); *Moran Towing and Transportation Co. v. United States*, 80 F.Supp. 623, 631 (S.D.N.Y.1948) (divided duties make one an insufficient lookout).

Rule 29 of the International Rules of the Road, which must be followed by vessels of United States registry, under 33 U.S.C. § 1051, provides that:

> "Nothing in Sections 1061 to 1094 of these Rules shall exonerate any vessel, or the owner, master or crew thereof, from the consequences of any neglect to carry lights or signals, or of any neglect to keep a proper lookout, or of the neglect of any precaution which may be required by the ordinary practice of seamen, or by the special circumstances of the case." 33 U.S.C. § 1091.

As Admiral Patterson, an expert witness called by Cargo Claimants, testified, one maintains a vigilant lookout not so much by keeping an eye out for routine matters, but by being alert for the unexpected. The evidence shows, and I find, that Chaffin failed to make proper visual observations of COLOMBIA, and his conduct fell short of the standard required for a proper lookout. I therefore conclude that those charged with the navigation of the TRANSHAWAII also failed to exercise proper seamanship.

Whether this failure to prudently navigate the TRANSHAWAII was a proximate cause of the collision is however a separate question. The expert testimony makes it clear that given the relative positions of the two vessels at the time of the steering failure, a proper lookout stationed on the starboard wing of the TRANSHAWAII would have detected the COLOMBIA veering after that ship had turned between 10 and 20 degrees. Such a significant movement would have been detectable from the shift in the alignment of the kingposts on COLOMBIA's deck and from the curve in the freighter's wake which would have been visible from the bridge of TRANSHAWAII. The testimony of Anthony Suarez, expert in navigational science, called by Hudson Waterways, and Exhibit E-33 show that the COLOMBIA had in all likelihood turned 10 degrees just over one minute and 20 seconds after her loss of steering, and that she had turned 20 degrees, slightly more than two minutes after the failure. Thus, even if one gives all of the benefit of the doubt to the TRANSHAWAII, the Court is convinced that a lookout would have noticed a significant shift in the course of the COLOMBIA at least two minutes prior to the collision. All the experts agree that this would have been sufficient notice to permit successful evasive action by the TRANSHAWAII. In fact, up until one minute prior to the collision the experts believe that the TRANSHAWAII could have avoided the accident by applying a hard right rudder which would have permitted her to pass under the stern of the COLOMBIA. Lest the suggestion that TRANSHAWAII should have turned to the right take on the appearance of a conclusion after the event, we note that if COLOMBIA's change in course had been observed by TRANSHAWAII at least 90 seconds prior to the collision, TRANSHAWAII could have avoided the collision as well by stopping her engines or by steering hard left, away from the danger. This latter tactic would come nearest to a likely instantaneous reaction; few steer into danger. But, since Chaffin did not discover the danger until COLOMBIA was almost dead ahead, his hard left rudder order had no effect.

TRANSHAWAII's failure to take evasive action in time, and the collision which ultimately resulted were direct and reasonable foreseeable consequences of the failure to maintain a proper lookout.

■ The TRANSHAWAII seeks to avoid liability by claiming that it could not possibly have anticipated the sharp left turn taken by the other vessel. That, however, is not what is charged here. TRANSHAWAII *failed to observe* a sharp veer to port by a vessel which was only three quarters of a mile off her starboard bow. And what is more, this failure to observe what would have been obvious to a properly stationed lookout, or even to Chaffin, if he had been paying attention, lasted for almost three and one half minutes, until it was too late for TRANSHAWAII to avoid collision. Under these circumstances Hudson cannot possibly meet its burden under the rule of *The Pennsylvania*, 86 U.S. (19 Wall.) 125, 22 L.Ed. 148 (1873). That rule provides that when a vessel has violated a statutory rule (such as Rule 29), she has the difficult burden of showing " . . . not merely that her fault might not have been one of the causes, or that it probably was not, but that it could not have been." *Id.* at 136. See also *Ira S. Bushey & Sons v. United States*, 172 F.2d 447, 448 (2d Cir. 1949). TRANSHAWAII has fallen far short of meeting this burden. All the evidence in this record makes it clear that if Mate Chaffin had maintained a proper lookout or if he had called up a special lookout when he began to occupy himself with taking a fix, then he would have had more time to meet the crisis with which he was faced and would have had a good chance to avoid the collision by steering hard left, or hard right (his best option), or by stopping the engines. Thus the failure to maintain a proper lookout substantially contributed to and was one of the causes of the collision.

Grancolombiana argues that while both vessels may have been at fault, TRANSHAWAII had the last clear chance to avoid the collision and should thus bear the entire burden of fault. See *The Cornelius Vanderbilt*, 120 F.2d 766, 768 (2d Cir. 1941).

■ There is some doubt whether and to what extent the last clear chance doctrine will survive the adoption of the rule of comparative fault in *Reliable Transfer*. Be that as it may, and assuming that the doctrine of last clear chance survives, I find and conclude that doctrine is not applicable to the facts of this collision. This is not a case where one party's prior negligence has placed him in a helpless situation, and then the other party subsequently discovering the danger fails to exercise reasonable care to avoid injury. Here, poor seamanship was exercised by both Rodriguez and Chaffin at almost the same moment. Furthermore, by the time Chaffin discovered the danger he could not, through the exercise of reasonable care, have avoided the collision. Further, the last clear chance doctrine should not be applied to the facts here because by virtue of Rodriguez's failure to signal promptly with the whistle, TRANSHAWAII never had a clear chance to take evasive action.

## Conclusion as to Fault

■ The Court concludes that both vessels were at fault and in the absence of any other factors they must proportionately share responsibility for the collision in accordance with the principles laid down by the Supreme Court in *United States v. Reliable Transfer Co., Inc.*, 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975). Apportionment of fault will be discussed below.

## COLOMBIA's Unseaworthiness

■ If not exonerated, COLOMBIA seeks to limit its liability for damages pursuant to 46 U.S.C. § 183.[6] Here, Hudson

---

**6.** This statute provides in relevant part:
"(a) The liability of the owner of any vessel, whether American or foreign, for any embezzlement, loss, or destruction by any person of any property, goods, or merchandise shipped or put on board of such vessel, or for any loss, damage, or injury by collision, or for any act, matter, or thing, loss, damage, or forfeiture, done, occasioned, or incurred, without the privity or knowledge of such owner or owners, shall not, except in cases provided for in subsection (b) of this section,

and the Cargo Claimants have the initial burden of establishing that COLOMBIA was unseaworthy when she broke ground at Jacksonville, Florida, the day before the collision. If this appears, then Grancolombiana must prove that it is entitled to the protection of this section because of its lack of privity or knowledge as to the condition of unseaworthiness on board the vessel. *Application of Theisen*, 349 F.Supp. 737 (E.D.N.Y.1972); *In re Marine Sulphur Transport Corp.*, 312 F.Supp. 1081, 1092 (S.D.N.Y.1970), *aff'd in part, rev'd in part on other grounds*, 460 F.2d 89 (2d Cir.), *cert. denied* 409 U.S. 982, 93 S.Ct. 318, 34 L.Ed.2d 246 (1972). Grancolombiana will show lack of privity by proving it exercised due diligence to make the vessel seaworthy at the start of the voyage. The vessel owner either must explain the cause of the loss and show its lack of privity to or knowledge of this cause, or if it cannot show precisely how the loss occurred, it must exhaust all possibilities and show that as to each one, it was without the requisite privity or knowledge. *Terracciano v. McAlinden Construction Co.*, 485 F.2d 304, 307–08 (2d Cir. 1973).

■ While the Court has concluded that poor seamanship by Rodriguez was a proximate cause of the collision, it cannot seriously be maintained that Rodriguez was in any way unfit for duty as the First Officer of the COLOMBIA. He had the necessary educational background, had qualified for a first officer's license, and had sailed extensively on COLOMBIA and her sister ships. There was nothing in Rodriguez's background which could be said to give Grancolombiana notice of any unfitness for duty or which would suggest any inability to respond under pressure. While Rodriguez may have exercised poor seamanship, his presence at the wheel did not make the vessel unseaworthy. So much of Hudson's claim of unseaworthiness founded on a contention that COLOMBIA was improperly manned is rejected.

Nor was it unseaworthiness to permit the First Officer to man the bridge alone, while the seaman assigned there tended to deck chores, apparently a common practice. Had Rodriguez reacted properly, he could have met the emergency caused by the steering failure, without need for another man on the bridge.

■ We will further simplify the discussion of unseaworthiness by eliminating several other contentions of unseaworthiness, or failure to exercise due diligence, charged against COLOMBIA. First, it is said that the gyro compass alarm failed to sound when the vessel first went off course, and had it done so, Rodriguez would have known that he had lost steering control. It is true that due to a run-down battery the gyro compass alarm did not sound as it should have, but this is not in itself evidence of unseaworthiness causing the collision. Since Rodriguez, an experienced mariner, knew from his observation of the sun on the water that the ship's heading had changed almost immediately, and this observation was borne out by a reference to the magnetic compass, the failure of the gyro compass alarm to function can hardly be regarded as causative of the collision.

More serious is the failure of the steering equipment, and the related failure of the emergency generator, which are discussed below.

■ I find unseaworthiness of COLOMBIA based on neglect to inspect and service the equipment, after actual notice, discussed below, which led to the failure of the electric steering system to function properly. A shipowner will not be permitted to limit its liability if its managing officer or supervising personnel knew or should have known that the vessel was improperly equipped. *Waterman Steamship Corp. v. Gay Cottons*, 414 F.2d 724 (9th Cir. 1969).

All the evidence in this case supports a finding that the steering equipment failed

exceed the amount or value of the interest of such owner in such vessel, and her freight then pending."

The rights of Cargo Claimants are governed by the Carriage of Goods by Sea Act, 46 U.S.C. § 1301, *et seq.*, which is quoted in relevant part at p. 723 of the text.

at approximately 1640 hours on September 14, 1972. From the facts that (1) the gyro compass was stuck on 000° as the ship's heading turned to port; (2) both the manual and the pushbutton steering controls failed to operate the rudder so as to bring the ship to starboard; and (3) the electric power in the radio room adjacent to the wheelhouse failed at about the same time, it seems fairly certain that a localized power failure occurred on the bridge. There is no evidence that the power failed in the other parts of the ship.

Unexplained failure of electrical power on a ship which depends on that power to operate its steering system must be regarded by an owner as a serious matter, affecting seaworthiness. Perhaps a single such incident could be considered a freak occurrence, but the evidence here shows that electrical failures and a resultant loss of electrical steering capability were nothing new on board COLOMBIA. On August 13, 1972, just one month before the collision, the electrical power in the entire ship had gone out for a few moments, and when power was restored, the rudder did not respond to the signals from the console at the bridge, either automatic, manual or pushbutton. At that time COLOMBIA was approaching Santa Marta, Colombia and she was able to continue her voyage only by having the quartermaster stand at the stern of the vessel, where the manual wheel is located and from there execute the steering orders transmitted to him from the bridge by means of a hailing horn. In this fashion the vessel was able to reach Santa Marta safely on the following day, making a number of intricate and successful maneuvers.

A repairman, Hernando Fajardo, was called to fix the steering mechanism. Mr. Fajardo testified at the trial as a witness for Grancolombiana. He is President of Electronica Inmar of Baranquilla, Colombia, and had completed technical studies in maritime electronics in Colombia and the United States. His firm was the Colombian representative of Raytheon Corp. and several other respected manufacturers of maritime equipment. However, it should also be noted that Mr. Fajardo did not have a

degree in engineering, and that his firm was not engaged primarily in repairing electrical steering systems on ships. He testified that his company did general repair work on televisions, motors, coils, electrical installations in factories and other types of minor work. Before he boarded the COLOMBIA on August 14, 1972, he had never worked on an A.E.G. Sperry steering system.

Mr. Fajardo was accompanied by Mr. Gomez, the resident agent for the Grancolombiana line in Santa Marta. The purpose of their joint visit was to inspect and repair the steering equipment. Fajardo was informed that while at sea on the previous day an oiler had attempted to take one of COLOMBIA's two operating generators out of service, mistakenly thinking that the remaining generator would be sufficient to carry the load. However, it could not. A drop in voltage occurred, and as current surged through the single generator, there was an overload on the system. To prevent extensive damage, it was necessary to turn off all of the power in the ship for a few moments. When power was restored, it was discovered that the steering console on the bridge would not operate.

Mr. Fajardo began his inspection by asking Chief Electrician Perez if the fuses in the steering system had been checked. He accepted Perez's statement at face value, that mate Delgado had checked the fuses after the loss of power and had found them to be in order. Accepting such a representation is not the mark of a good technician. He then spent five hours making comprehensive tests on the steering system, including visual checks of the cables, resistors, transformers, and generators on board. He checked the equipment on the bridge. Everything seemed to be in good working order. The voltage feed out of the engine room was normal and so was the voltage being fed into the steering room. However, at the output, one of the phases was producing no voltage. At last, after almost five hours of fruitless effort, Fajardo de-energized the system, took out each fuse, and tested it with an ohmmeter. Upon dis-

covering that two of the fourteen fuses were burned out, he replaced them with two new fuses. He then energized the system and found that the voltage flowed normally.

Fajardo then went to the bridge and spent two more hours testing the steering gear. He found that it worked satisfactorily, subject to a minor mechanical adjustment which he had to make because the rudder angle indicator was improperly calibrated by one to one and one-half degrees. Fajardo then made out his report and left the vessel.

No other technicians or engineers examined the steering mechanism, no expert from Sperry or A.E.G. visited the ship or was even notified about the steering failure or the replacement of the fuses, and no responsible official of Grancolombiana notified the American Bureau of Shipping about this incident.

While the Court believes that Mr. Fajardo testified truthfully as to his activities, it must also conclude his work on the ship, as supervised, assisted and observed by Gomez and Perez of Grancolombiana, did not discover nor remove the underlying defects in the ship's electrical steering system.

Fajardo was a technician whose primary task was to get the steering mechanism back in working order. He did this by replacing the two blown fuses. However, any reasonably competent electrical engineer, and indeed, any student of high school physics, would understand that finding a blown fuse and replacing it will not repair a defective electrical circuit. Unless what caused the particular fuse to burn out is determined and then that cause is corrected or eliminated, the machinery cannot be regarded as having been restored to a sound condition simply by changing a fuse. A blown fuse is a symptom, not a defect in itself.

As noted, when Fajardo boarded the vessel, he accepted at face value a statement by others that the fuses were good, and then proceeded to conduct five hours of tests before verifying this threshold matter. Because Fajardo had been told that a volt-

age drop on the previous day had caused a surge in current and forced a shutdown, he assumed this event was the cause of the burnt-out fuses, and the subsequent failure of the steering system.

It was unreasonable to have accepted this statement without conducting his own tests as to what might make these two fuses burn. Given the false or misleading statement about the condition of the fuses at the time he boarded the ship, any further explanations from the crew of the COLOMBIA should have been viewed with suspicion. What is more, Fajardo saw that the two fuses were on different circuits (one was on the automatic-manual circuit and the other was on the pushbutton circuit), and he knew or should have known that it was physically impossible for both of them to burn out simultaneously. Thus the crew's story as to the voltage drop and current surge of the previous day could not by itself have explained fully the cause of a simultaneous burn-out of these two fuses.

With all that information before him, Fajardo should have made an independent effort to ascertain for himself what was the true cause of the blown fuses. And owner's representative Gomez should have required him to do so. This would have required much more intensive testing than he actually engaged in, including perhaps a reconstruction of the previous day's voltage drop in order to see whether such a condition could cause these two fuses to blow. Yet no such tests were ever carried out by Fajardo or anyone else. After the fuses were replaced, he observed that everything functioned properly and he did not press the inquiry any further.

Of course there is another possibility as to the fuses. Delgado may have been telling the truth; the fuses may have been sound when Fajardo boarded the vessel and they may have only blown out when he attempted to re-energize the system during the tests. If this is indeed what happened, it would indicate that there was in fact some underlying defect in the electrical system, because Fajardo did not put any undue stresses or overloads on it during his tests.

In fact, Fajardo admitted that the fuses might have been intact when he boarded the ship and that he himself could have blown the fuses when he tested the equipment, if there was some latent defect in the electrical system.

The Court concludes that Fajardo, and the owner, did not exercise due diligence to investigate this other alternative. For one who had been dispatched to make a personal investigation, he accepted too eagerly the explanation that Delgado had been mistaken when he tested the fuses on the previous day. Testing a fuse is not that difficult.

If all the other electrical equipment had appeared to be in proper condition, the Court might attach less importance to the shortcomings of Fajardo's investigation. However, the evidence shows that the emergency switchboard panel, which was located near the door leading to the weather deck, was seriously corroded at this time by salt air and water. This heavy copper corrosion was discovered by Mr. Woodward and Mr. Fife after the collision, but their testimony was to the effect that the corrosion was a product of many months of exposure to the harsh elements. The corrosion was so serious that it apparently knocked out the automatic transfer switch. Its purpose is, in the event of a failure of the main generator, to transfer the electrical load automatically to the emergency generator. Thus in the event of a power failure on the ship, this corrosion might have prevented the emergency switchboard from automatically supplying power to vital electrical circuits such as the radio room and the steering mechanism.

Fajardo and Gomez should have discovered this corrosion and remedied it, but they didn't. In fact, there is no evidence that he ever inspected the emergency switchboard panel, even though the starboard feeder cable normally used by the steering system ran through that switchboard. This is further evidence of a failure to exercise due diligence to make the ship seaworthy, as well as an indication that the ship's electrical control circuits were not reasonably fit for their ordinary intended purposes when

COLOMBIA left Santa Marta, and thereafter, when she left Jacksonville. All the experts agree extensive corrosion in the electrical switches of the type discovered on board the COLOMBIA is a serious condition and one which calls for immediate corrective action.

The Court concludes that Hudson has sustained its burden of proving that the ship was unseaworthy when she broke ground on her voyage to Baltimore. Furthermore, this unseaworthiness was a fact which was known to the owners of the vessel. While Fajardo was an independent contractor, the limited repair work which he did and his failure to inquire further into what were serious problems with the electrical circuits were fully known to Grancolombiana through the presence of the Chief Electrician Perez and Mr. Gomez, the port agent who himself was a qualified engineer. In fact, Gomez, reported directly to Captain Castenada in Bogota, the superintendent in charge of maintenance for all of Grancolombiana's vessels. See *Great Atlantic & Pacific Tea Co. v. Brasileiro*, 159 F.2d 661 (2d Cir. 1947). Fajardo also communicated with Castenada when he sent a written report on the specific work which he had performed on board the vessel.

All of this evidence supports a finding that Grancolombiana is chargeable with knowledge of the fact that Fajardo's inspection was totally inadequate in light of a potentially serious problem with the electrical circuits. Upon receiving this report, Grancolombiana should have taken steps to contact a representative of Sperry or A.E.G. to determine the underlying cause of the failure. The Sperry Instruction Manual describing the Combined Steering Control System (Exhibit E–16) advises:

"The manuals do not provide detailed instructions on the servicing of the equipment *which must be carried out, at all times, by a Sperry Service Engineer.*" (Emphasis ours).

See also Exhibit 16–A, which contains similar language.

Surely Grancolombiana must be charged with knowledge of the contents of these

Manuals, which warned that servicing should be performed by a Sperry representative. Also, since the owner had a duty to exercise due diligence to keep the vessel in a seaworthy condition, it must be charged with knowledge of the corrosion which would certainly have been uncovered by a thorough investigation.[7]

Petitioner argues that there was no proof that a failure of the fuses, or the corrosion in the emergency switchboard or either or both of them, had anything to do with the collision on September 14th. Indeed it points to the testimony of its expert Robert Walker who found the fuses to be in good condition when he made his survey after the collision. Plaintiff, however, misconstrues the law on this issue. Once Claimant has proven that the vessel was unseaworthy, then the petitioner must come forward with evidence explaining the cause of the loss and demonstrating that it had no knowledge of this cause. If it cannot show precisely how the loss occurred, then it must exhaust all the possibilities and prove that as to each one, it was without the requisite privity or knowledge. *Terracciano v. McAlinden Const. Co.*, 485 F.2d 304 (2d Cir. 1973). This burden has not been discharged.

First of all, petitioner has not come forward with any explanation as to the reason for the steering failure. In fact, Mr. Walker has stated that as far as he can tell, the electrical steering console was working properly up until and including the time of the collision. This evidence seemingly contradicts petitioner's other witness, Rodriguez. Walker's testimony, even if believed, and I do not, when combined with the events recounted by Rodriguez, leaves open a myriad of possibilities.

Since it failed to offer any explanation as to why the steering failed, in order to invoke the protection of the limitation of liability statute, the owner must exhaust all the possible causes of the mishap and show that it had no knowledge of and was not privy to any of them. *The S. S. Hewitt*, 284 F. 911, 912 (S.D.N.Y.1922) (Hand, L., J.)

Grancolombiana has clearly failed to exhaust all the possibilities. Some sort of localized power failure occurred on the bridge at 1640 hours on September 14, 1972. It disabled the automatic gyro pilot, the manual electric steering and the pushbutton system. The radioman in the room adjacent to the wheelhouse had to place his instruments on auxiliary battery power, and the gyro compass was stuck on 000° even after the ship turned 90° to the left. The Court notes that among the functions of the ship served by the emergency switchboard were the steering gear, the gyro compass, the radio system and some of the ship's navigation lights. Except for the lights, not in use at 1645 hours on a summer day, we know that all of these other vital circuits failed at the same time. This fact makes it likely that there was more than sheer coincidence involved. Yet petitioner has offered no coherent explanation.

Claimants have offered at least the plausible theory that the corrosion in the emergency switchboard short-circuited the power supply to the bridge without affecting the flow of power to other parts of the ship. This was at least possible because the starboard transmitter cable, which was in use on the day of the collision, ran through the emergency switchboard. Because this corrosion could have been discovered by Fajar-

---

**7.** The witness Walker found nothing wrong with the mechanical or electric steering gear on the COLOMBIA. However, when he removed the rudder watcher cover, he found that a stud connecting a jumper wire between two of the resistors in the rudder watcher had broken off and fallen down into the case of the rudder watcher. He found a full contact, notwithstanding this circumstance (Tr. p. 236). This broken stud might have occurred during the collision, and might have had nothing to do with the systems for steering from the bridge, which had failed immediately prior to the collision. It is also possible that the broken stud was in existence before the collision, and even on August 13th, when Fajardo replaced the fuses. If so, this would be regarded as of no significance, since a diligent inspection of the steering system would not extend reasonably to removing the cover from the rudder watcher, simply to see if there were a broken stud inside, when there was no reason to expect any such difficulty.

do through the exercise of due diligence, the owners of a ship may be said to have had notice of this unseaworthy condition.

Indeed, many other possible causes exist, but Grancolombiana has not even attempted to refute them. Since petitioner has not, and cannot, exhaust all the conceivable explanations for the power failure, for this ground alone, as against Claimant Hudson Waterways, the petition for limitation of liability must be denied.[8]

*The Cargo Claimants*

 As against the Cargo Claimants, plaintiff seeks the benefit of COGSA, 46 U.S.C. § 1300, *et seq.*, which was expressly incorporated into the bills of lading issued by COLOMBIA, and applies here because her cargo was destined for U.S. ports.

Section 4(2) of COGSA, 46 U.S.C. § 1304(2)(a) provides:

(2) Neither the carrier nor the ship shall be responsible for loss or damage arising or resulting from—
 (a) Act, neglect, or default of the master, mariner, pilot, or the servants of the carrier in the navigation or in the management of the ship."

Under this section the burden is on the shipowner (here Grancolombiana) to establish that this collision was due to the excepted peril of negligent navigation. *Director General of India Supply Mission v. S. S. Maru*, 459 F.2d 1370, 1372 (2d Cir. 1972). Since the Court has found that poor seamanship by First Mate Rodriguez was a cause of the collision, Grancolombiana has sustained its burden. Once the shipowner has brought itself within this excepted peril, then the burden shifts to the shipper to show that the ship was unseaworthy and the damage to the cargo was caused by such unseaworthiness. *Firestone Synthetic Fibers Co. v. M. S. Black Heron*, 324 F.2d 835, 837 (2d Cir. 1963).

Our prior discussion of the problems with the electrical steering mechanism is relevant in deciding this issue. The Court has concluded that COLOMBIA was unseaworthy when she embarked on her voyage for Baltimore, because the underlying cause of the blown fuses had not been detected or corrected, and the corrosion on the emergency switchboard should have been discovered and removed. Furthermore, since it is more likely than not that the power failure on the bridge grew out of some latent defects in the electrical control circuits and since the collision was a direct consequence of the loss of power steering, the causal link between the unseaworthiness and the electrical malfunction has been established. Thus the damage to the cargo was as much a result of the unseaworthiness of the vessel as it was of the poor navigation.

Grancolombiana also seeks exoneration from the cargo claims under Section 4(1) of COGSA, 46 U.S.C. § 1304(1). That section provides in relevant part:

"Neither the carrier nor the ship shall be liable for the loss or damage arising or resulting from unseaworthiness, unless caused by want of due diligence on the part of the carrier to make the ship seaworthy, . . . Whenever loss or damage has resulted from unseaworthiness, the burden of proving the exercise of due diligence shall be on the carrier or other persons claiming exemption under this section."

---

**8.** A bizarre aspect of the collision is that COLOMBIA's rudder could not have moved from dead ahead to 32½ degrees left, unless acted upon by a powerful force. In view of the electrical failure, it is doubtful that the hydraulics were activated so to move the rudder. Did a Nix, or a disgruntled and malevolent wiper activate the trick wheel in the steering locker? Hardly likely, but this is as logical as any other explanation which has been brought forward. Indeed, on September 27th at Newport News, Woodward (Tr. p. 383) found the clutches engaged for manual steering from the boat deck, rather than electrically. We cannot attribute much significance to this fact, because it is likely that the towing company attempted to change the rudder position after the collision, to ease its task. In short, the failure of the electrical system between the bridge and the steering engine is explained, but the rapid movement of the rudder to the left following the failure of the steering has no logical and reasonable explanation. No suggestion, however, could exonerate COLOMBIA from fault for the unseaworthiness and negligent navigation mentioned in the text.

The evidence shows and the Court finds, that the efforts of Mr. Fajardo in replacing the two fuses fell far short of the standard of due diligence needed if a shipowner is to be exonerated under this statute. He failed to make a personal investigation into the causes of the burnt fuses, relying instead upon the explanation given by the crew. He knew or should have known that the two fuses were on different circuits, and that they could not have burned out simultaneously. Nor did he look into the fact that no other fuses on the ship had blown, even though the voltage drop had affected all electrical circuits on the ship, and not just the steering equipment. Finally, he did not test the resistances in the emergency switchboard panel, and failed even to notice such a serious danger sign as the copper corrosion on the emergency switchboard. Given the importance of the power steering system to the safety of the vessel, its crew, and its cargo, the whole incident at Santa Marta was treated very casually by the responsible officials at Grancolombiana. *The Agwimoon*, 24 F.2d 864, 866 (D.Md.1928), *aff'd* 31 F.2d 1006 (4th Cir.), *cert. denied* 279 U.S. 874, 49 S.Ct. 514, 73 L.Ed. 1009 (1929). It was short-sighted not to alert the manufacturers of the electrical steering system; it was equally wrong not to notify the American Bureau of Shipping.

While the Court is not prepared to say that a full survey of the ship was required, in light of all the facts and circumstances of the case, Grancolombiana has not satisfied its burden of proving that it exercised due diligence to make this vessel seaworthy. The measures taken by the petitioner were inadequate and the law is clear that any doubts must be resolved against the shipowner. As Judge Murphy of this Court once stated:

"The burden was upon the owner to show by making proper and reasonable tests that the vessel was seaworthy and in a fit condition to receive and transport the cargo undertaken to be carried, and if by the failure to adopt such tests and to furnish such proofs the question[s] of the ship's efficiency is left in doubt, that doubt must be resolved against the shipowner and in favor of the shipper."

*Standard Oil Co. (N.J.) v. Anglo-Mexican Petroleum Corp.*, 112 F.Supp. 630, 639 (S.D.N.Y.1953), quoting from *The Southwark*, 191 U.S. 1, 15, 24 S.Ct. 1, 48 L.Ed. 65 (1903); see also, *The Vizcaya*, 63 F.Supp. 898, 904 (E.D.Pa.1945), *aff'd* 182 F.2d 942 (3d Cir.), *cert. denied* 340 U.S. 877, 71 S.Ct. 124, 95 L.Ed. 638 (1950).

Grancolombiana cannot therefore benefit from the exemptive provisions of COGSA and is thus liable to the Cargo Claimants for the damages sustained by them in this collision.

## COLOMBIA Cargo Claimants' Rights Against TRANSHAWAII

Upon well-established principles the Cargo Claimants whose property was being transported on board the COLOMBIA are entitled to a full recovery from the non-carrying vessel, here the TRANSHAWAII, if the latter ship has by its own negligence contributed to the collision. *The Atlas*, 93 U.S. 302, 23 L.Ed. 863 (1876); *The Beaconsfield*, 158 U.S. 303, 15 S.Ct. 860, 39 L.Ed. 993 (1895); *The New York*, 175 U.S. 187, 20 S.Ct. 67, 44 L.Ed. 126 (1899). Since the Court has already held that the TRANSHAWAII's failure to maintain a proper lookout makes it partly responsible for the collision, under these old precedents the Cargo Claimants are entitled to a judgment holding the TRANSHAWAII jointly and severally liable with the COLOMBIA for the property damage suffered by them.

TRANSHAWAII may then include any payments made to cargo in satisfaction of such a judgment as part of its overall damages for purposes of striking a balance with COLOMBIA, the carrying vessel. *The Chattahoochee*, 173 U.S. 540, 19 S.Ct. 491, 43 L.Ed. 801 (1899).

An interesting question arises here, however, in light of the *Reliable Transfer* case, *supra*. Under admiralty case law prior to that recent enactment, if two ships were each at fault in bringing about a collision, whatever the relative degrees of fault, they split the total damages equally. The Su-

preme Court in *Reliable Transfer* over-turned this old rule of divided damages in order to allocate more accurately liability in proportion to the relative faults of the two vessels. One question which the Court did not deal with was whether this new proportional damages rule changes the right of innocent cargo owners to obtain a full recovery from the non-carrying vessel. Within the specific context of this case, the Court must decide whether, as before, the Cargo Claimants can recover 100% of their damages from the TRANSHAWAII, or whether they are now limited to a recovery of that proportion of fault attributable to the TRANSHAWAII.

■ This Court believes that the better rule would be to allow the Cargo Claimants a full recovery against the non-carrying vessel, allow the latter to add the payments it makes to cargo to its own damages, and then permit it to recover this total from the carrying vessel in proportion to the fault of the carrying vessel. This resolution would be more in accord with the principles enunciated in *Reliable Transfer*, which allocated liability proportionately among the parties at fault. No fault can be alleged or proved as against the innocent cargo owners. In the absence of a clear directive from the Supreme Court overruling prior cases, Grancolombiana's fault should not be imputed to the Cargo Claimants here. *Reliable Transfer* was intended to change the rule of damages so that the burden would fall more equitably on those parties whose fault contributed to the collision. It cannot be said, as Hudson urges here, to have altered long-established rules by imputing the fault of the carrying vessel to innocent cargo owners.

In asserting that its liability for damages to cargo should be limited to the percentage of fault attributable to it, Hudson points out that if Cargo can recover in full from the TRANSHAWAII, and if the latter's claim over against the COLOMBIA were to be frustrated in part by the limitation of liability to an inadequate fund, or insolvency, then TRANSHAWAII would be left to bear, unfairly, most if not all of COLOMBIA's Cargo Claimants' damages. Whatever the theoretical merits of this argument, the Court need not reach it, having denied COLOMBIA's petition for limitation.

## COLOMBIA's Claim for General Average Against Cargo Claimants

After the collision, Grancolombiana, as owner of the COLOMBIA, claimed a general average contribution from Cargo, and appointed the John F. Curry Agency, Inc. as average adjustors. The Statement of General Average prepared by this agency claims a total contribution from the various cargo owners of $912,139.40. Cargo interests deny that they are liable for any contribution based on general average.

■ The principle of general average contribution requires that when one who participates in a maritime venture incurs loss for the common benefit, it should be shared ratably by all who participate in the venture. *SeaLand Service Inc. v. Aetna Insurance Co.*, 545 F.2d 1313, 1315 (2d Cir. 1976). But an owner is not entitled to general average contribution where the damages are the result of negligent navigation. *The Irrawaddy*, 171 U.S. 187, 18 S.Ct. 831, 43 L.Ed. 130 (1898).[9] Nor is it availa-

---

**9.** In *The Jason*, 225 U.S. 32, 32 S.Ct. 560, 56 L.Ed. 969 (1904), the Supreme Court approved a clause in a bill of lading which provided that if the shipowner exercised due diligence to make the vessel seaworthy, he would be entitled to a general average contribution from cargo owners, notwithstanding any negligent navigation of the vessel. With the aid of such provision in the bill of lading the shipowner could thus recover in general average, so long as he had proved due diligence.

Clause 22 of the bill of lading used in this case by Flota Mercante Grancolombiana, S.A.

contains what has become known as a "*New Jason Clause.*" See Carver, *Carriage by Sea*, p. 872 (12th ed. 1971). This Clause specifically permits the shipowner to recover a general average contribution from the cargo owners "[i]n the event of accident, danger, damage, or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequences of which, the carrier is not responsible, by statute, contract or otherwise . . . ."

ble where the owners of the vessel do not exercise due diligence to make the vessel seaworthy at the inception of the voyage. A case closely in point is *Erie & St. Lawrence Corp. v. Barnes-Ames Co.*, 52 F.2d 217, 219 (W.D.N.Y.1931) in which general average was denied where no searching test of the steering gear was made. Since due diligence was not exercised, the claim for general average is denied.

### Apportionment of Fault Between COLOMBIA and TRANSHAWAII

In allocating responsibility for the collision, the greater part of the fault by far must rest on COLOMBIA because she was unseaworthy, and navigated in a negligent fashion. The seamanship displayed by the Chief Mate when the steering mechanism malfunctioned was extremely poor. Equipment, however sophisticated in design, is likely to fail. His neglect, in failing to blow the whistle, or to stop the engines, or both, immediately on discovery of the failure of the steering console, taken together with the fact that he made no attempt to order a manual right rudder by the trick wheel in the steering locker, or by the hand operated wheel on the after deck, is a significant cause of the collision. Standing by itself, this negligent navigation was fault of a high order. Additional weight in the scales, against COLOMBIA, is her unseaworthy condition described above, and the negligent fashion in which those charged with her inspection and maintenance responded to the prior steering failure at Santa Marta. When COLOMBIA left Santa Marta, and when she left Jacksonville, she was a floating danger and risk to all nearby craft. It was entirely foreseeable that as in fact happened, the steering console would fail again, and would do so in proximity of another vessel, and that those charged with COLOMBIA's navigation would fail to meet the emergency. Accordingly, as noted above, most of the fault must be charged to COLOMBIA.

Where, as here, the carrier is made responsible for the damage because the owner failed to use due diligence to make the COLOMBIA sea-

Insofar as concerns TRANSHAWAII's fault, we must remain mindful of the importance of enforcing our traditional policy: those in charge of navigating a vessel must at all times be watchful for the unexpected. Had a proper lookout been maintained, the collision could have been mitigated, and perhaps avoided. To protect our interest in watchfulness from the bridge, we must assess a part of the fault against TRANSHAWAII.

The rule of *Reliable Transfer* injects into collision cases the difficult problem of the Chancellor's foot. That is to say, different courts exercising maritime jurisdiction over similar causes will find differing allocations of fault, depending on the perceptions held of specific errors or omissions. Perhaps this is unavoidable.

█ Based on the entire trial record, and the foregoing findings, and because COLOMBIA's serious shortcomings so far outweigh the blame which is fairly attributable to the TRANSHAWAII's failure to notice COLOMBIA's change of course, the Court apportions responsibility for the collision as follows: TRANSHAWAII—17.5%; COLOMBIA—82.5%.

The foregoing, together with the Undisputed Facts in Paragraph III of the Pre-Trial Order dated June 17, 1974, and the formal Findings and Conclusions, submitted by the parties as modified and signed by the Court, to the extent not inconsistent herewith, constitute this Court's Findings of Fact and Conclusions of Law in accordance with Rule 52, F.R.Civ.P.

Settle an Interlocutory Judgment pursuant to 28 U.S.C. § 1292(a)(3) on ten (10) days notice to all counsel appearing in all of the related cases.

worthy, no general average claim will lie against the cargo owners.